Dwayne GRAY, Plaintiff–Appellant,

v.

CUYAHOGA COUNTY SHERIFF'S
DEPARTMENT, et al.,
Defendants,

James Fuerst, Randy Ussery, and Dusan
Jevtich, Defendants–Appellees.

No. 97–1379.

United States Court of Appeals,
Sixth Circuit.

Argued May 1, 1998.

Decided July 27, 1998.

Thomas H. Bannigan (argued and briefed), Christensen & Bannigan, Detroit, Michigan, for Gray.

Jeffrey I. Sherwin, Office of the Prosecuting Attorney (argued and briefed), Justice Center, Cleveland, Ohio, Pamela J. Stevenson (argued and briefed), Office of the Attorney General, Tort Defense Division, Lansing, Michigan, Phillip I. Frame (briefed), for Fuerst and Jevtich.

Jeffrey I. Sherwin, Office of the Prosecuting Attorney (argued and briefed), Justice Center, Cleveland, Ohio, for Ussery.

Before: NELSON, BOGGS, and CLAY, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

Plaintiff Dwayne Gray appeals from an order of the district court granting a defense motion for summary judgment on his Fourth Amendment and due-process claims against defendants James Fuerst, Randy Ussery, and Dusan Jevtich.[1] Fuerst and Ussery are Cuyahoga County sheriff's deputies; Jevtich is an employee in the Identification Section of the Michigan State Police. Because the facts alleged, taken in the light most favorable to Gray, could support a jury verdict in his favor on his claims against Fuerst and Ussery, we now reverse in part and affirm in part.

## I

Gray, a resident of Michigan, was stopped by police officers in suburban Cleveland on September 24, 1993, and ticketed for driving without a license. After being released on his own recognizance, Gray appeared in court on October 19, 1993, and was sentenced to five days in jail for his traffic offense. When officers booked him at the North Royalton Jail, they discovered that the Michigan Department of Corrections ("MDOC") had an outstanding parole-violator warrant for a person named "Dwayne Gray," and that the MDOC requested extradition.

The next day, Cuyahoga County officials informed a judge of the municipal court that Gray was wanted in Michigan and that the MDOC had requested extradition. The judge then suspended the balance of Gray's five-day sentence and ordered him taken to the Cuyahoga County Jail, where the Cuyahoga County Sheriff's Department was to handle extradition proceedings. Gray immediately protested that he was not the person wanted by the MDOC, and he told the booking officers that his "brother Anthony uses his [identification] information." Having been informed of Gray's arrest, the MDOC mailed Fuerst copies of the warrant and the "Basic Information Sheet" pertaining to the "Dwayne Gray" wanted in Michigan. The Basic Information Sheet included the wanted man's name; birth date; FBI, State identification and Social Security numbers; information concerning his race, sex, height, weight, and other physical characteristics; and a photograph. Most of the information provided by the MDOC matched Gray exactly; however, the photograph looked nothing like him, and the physical description provided by the MDOC referred to certain scars that Gray did not have.

Gray continued to protest that he was innocent and that his was a case of mistaken identity. Therefore, on October 26, 1993— six days after he was booked at the Cuyahoga County Jail on suspicion of being the man wanted by the MDOC—Ussery contacted the Michigan State Police to obtain a copy of the fingerprints of the person identified in the MDOC's warrant and Basic Information Sheet. Jevtich processed this request, found a file jacket with information matching the MDOC information forwarded by Ussery, and sent Ussery by fax a copy of the fingerprint card contained in the file jacket. Jevtich also mailed a hard copy of the fingerprint card. The fingerprints on the card matched those of Gray.

---

1. Gray originally sued 12 defendants, including municipal entities and officials of Michigan and Ohio police and penal agencies. Prior to the summary judgment stage, Gray voluntarily dismissed all defendants other than Fuerst, Ussery, and Jevtich. The district court's summary judgment order, and this appeal, therefore relate only to these three defendants.

Meanwhile, counsel was appointed to represent Gray in the upcoming extradition proceedings. Gray continued to protest that he was not the person wanted by the MDOC. After the fingerprints sent by Jevtich to Ussery were found to match his own fingerprints, however, Gray was advised that it likely would be easier to clear up the problem if he went back to Michigan. Gray took this advice and waived extradition proceedings on November 22, 1993—more than a month after he was first incarcerated.

Gray arrived at the State Prison of Southern Michigan on Wednesday, November 24, 1993, the day before Thanksgiving. The administrative offices of the prison were closed over the holiday weekend. On Monday, November 29, 1993, when the offices reopened, Gray's fingerprints were found not to match the fingerprints of the wanted parole violator that were on file at the prison. Gray was released the same day.

As the magistrate judge found in the proceedings below, one basis of Gray's unfortunate mix-up was Gray's 1987 arrest by Detroit police officers for receiving stolen property. Although Gray was sentenced only to probation and served no jail time, his fingerprints were taken and sent to a central State Police file in Lansing. Gray also was assigned a State identification number, and a file with Gray's identifying information was opened. Gray was discharged from probation in February 1989. In October 1989, an old acquaintance of Gray named Earl Shaw was arrested in Muskegon, Michigan, on drug charges. Shaw, who also was a friend of Gray's brother, duped his arresting officers into believing that he was Gray; he used Gray's identifying information, and was convicted, sentenced, and incarcerated under the name of Dwayne Gray. After serving time in the custody of the MDOC, Shaw—whom the MDOC believed to be Gray—was paroled in February 1992. When he failed to report to a parole officer as directed, a warrant for his arrest was issued in October 1992. Because of Shaw's scam, the MDOC issued the warrant in the name of Dwayne Gray.

This warrant, intended for Shaw but issued in Gray's name, was the basis of Gray's incarceration in the Cuyahoga County Jail on October 20, 1993. The reason that all of the data contained on the Basic Information Sheet matched Gray was that Shaw purposely deceived the officers in Michigan into believing he was Gray. It thus follows that, when Fuerst and Ussery requested information on the Dwayne Gray wanted by the MDOC, and provided identifying information for the real Gray, Jevtich provided fingerprints from the real Gray's police file. Jevtich, who was merely an officer worker and had never seen Gray, had no way of knowing that the individual whose identifying information was provided by Fuerst and Ussery was not in fact Gray. Fuerst and Ussery, on the other hand, had more than just the cold data they provided to Jevtich: they had a mug shot and a physical description, neither of which matched the man they had in custody.

## II

Gray filed two separate complaints in this matter. On February 3, 1995, he filed suit against various defendants affiliated with Cuyahoga County, Ohio; Garfield Heights, Ohio (where he was stopped on the original traffic violation); and the Southern Michigan State Prison. On October 12, 1995, Gray filed suit against Fuerst, Ussery, Jevtich, and various other Michigan state officials. Gray later voluntarily dismissed his claims against all defendants other than Fuerst, Ussery, and Jevtich. The essence of his claims against these three defendants is that there was a vast discrepancy between, on the one hand, the photograph and physical description of the "Dwayne Gray" wanted by the MDOC, and on the other, the appearance of the real Gray; because of this difference, the defendants knew or should have been able to ascertain that they had the wrong man. According to Gray, the defendants' failure to discover that he was not the man wanted by the MDOC, and his resulting wrongful imprisonment for more than a month, violated his rights under federal and state law.

A magistrate judge recommended that the defendants' motions for summary judgment be granted, and that Gray's complaints be dismissed. Gray filed objections to the magistrate judge's report and recommendation,

focusing exclusively on his federal constitutional claims. The district court adopted the magistrate judge's recommendation and dismissed Gray's complaints. The sole issue on appeal is whether Gray's 41–day imprisonment, from October 20 through November 29, 1993, could have violated his constitutional rights, given that his jailers had in their possession a photograph and a physical description that did not match Gray's appearance.

## III

### A

██ The question presented by this case is whether someone who is wrongly imprisoned as a result of mistaken identity can state a constitutional claim against his jailers based on their failure to ascertain that they had the wrong man. The leading case on this issue is *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). In *Baker*, the Supreme Court held that where a plaintiff was arrested pursuant to a facially valid warrant, and where the plaintiff was detained for three days over the New Year's holiday despite his protestations of mistaken identity, the plaintiff's wrongful imprisonment did not give rise to a claim that the Fourth Amendment's prohibition against unreasonable seizures had been violated. The Court stated that "[w]hatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution." *Id.* at 144, 99 S.Ct. 2689. However, the Court went on to acknowledge that "[o]bviously, one in [the plaintiff's] position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment." *Ibid.* Perhaps envisioning a case such as Gray's, the Court then stated that "[w]e may even assume, *arguendo*, that, depending on what procedures the state affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in

the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty without due process of law.'" *Id.* at 145, 99 S.Ct. 2689.

Courts have had few opportunities to consider how long a period of wrongful incarceration must be before constitutional concerns are implicated. At least two courts, however, have found periods of incarceration based on mistaken identity to be long enough to state a constitutional claim under *Baker*. In *Rodriguez v. Roth*, 516 F.Supp. 410 (E.D.Pa. 1981), the defendant prison officials held the plaintiff in a county jail for 30 days on a facially valid warrant before discovering that they had the wrong man. In light of *Baker*, Judge Pollak ruled that the significantly longer period of incarceration (30 days versus three), coupled with the fact that the defendants apparently had the ability to discovery the error in identification, was sufficient to permit the plaintiff to take his case to a jury based on claims asserted under the Fourth, Fifth, and Sixth Amendments. *See id.* at 412. Similarly, in *Andujar v. City of Boston*, 760 F.Supp. 238 (D.Mass.1991), the plaintiff was kept in jail for 12 days despite repeated assertions of mistaken identity. The court discussed *Baker* and concluded that "plaintiff's allegation of an unlawful arrest and twelve-day imprisonment is certainly enough to state a claim for a deprivation of liberty without due process of law." *Id.* at 241. In particular, the court focused on the defendants' failure to "obtain photographic booking evidence" that they had the right man. *See id.* at 240.

██ We find these cases persuasive. Here, Gray was imprisoned for 41 days. It is conceded that he is not the person named in the warrant pursuant to which he was incarcerated.[2] There is no dispute that Fuerst and Ussery were in possession of a photograph that bore virtually no resemblance to Gray, as well as a physical descrip-

---

**2.** On appeal, Gray for the first time challenges the validity of this warrant. We decline to consider this issue, as it was not raised below.

tion detailing certain permanent scars that Gray did not have.[3] The photograph, in fact, was mailed to Fuerst on the first day of Gray's lengthy incarceration. Absent sufficient proof to the contrary—for instance, proof that Fuerst and Ussery never received the photograph of the "Dwayne Gray" wanted by the MDOC, or that they conducted a reasonable inquiry into the apparent discrepancy between the photograph and the appearance of the real Gray without uncovering any reason to believe that the Gray in custody was not the man wanted in Michigan—the trier of fact could find that the failure by Fuerst and Ussery to ascertain that they were holding the wrong person was unreasonable and thus violated Gray's Fourth Amendment and due-process rights. On remand, therefore, the principal question for the trier of fact will be whether Fuerst and/or Ussery used the degree of care a reasonable officer in their position would have used to ascertain whether the Dwayne Gray they had in custody was the person wanted by the Michigan authorities on the outstanding parole-violation warrant. This question will require resolution whether the defendants proceed on the merits, or whether they reassert the defense of qualified immunity. *Cf. Jackson v. Hoylman*, 933 F.2d 401, 403 (6th Cir.1991) (affirming district court's denial of officers' summary judgment motion and recognizing that, both for qualified-immunity and merits purposes, reasonableness issue is to be decided by jury using "objective reasonableness" standard).[4]

**B**

■ Unlike Fuerst and Ussery, defendant Jevtich never saw the photograph of Shaw posing as Gray. Moreover, because he worked in a Michigan State Police office rather than at the Southern Michigan State Prison, he had never seen either Shaw or Gray. Jevtich's sole involvement in this matter is that, as a state police fingerprint technician, he responded to Ussery's request for a copy of Gray's fingerprint card. Jevtich simply did his job, providing the fingerprint card from the file matching the identification information provided by Ussery. Jevtich did not participate (and was not asked to participate) in any investigation of Gray's true identity beyond simply providing the fingerprint card. Accordingly, Gray's claims against Jevtich were properly dismissed by the district court.

**IV**

For the foregoing reasons, the judgment of the district court is REVERSED in part, AFFIRMED in part, and REMANDED for further proceedings consistent with this opinion.

---

3. With some understatement, the magistrate judge found that "[m]ost of the information [provided with the Basic Information Sheet] matched Plaintiff exactly, although the photograph did not." The appellate record contains both the photograph of Shaw provided with the Basic Information Sheet and the booking photograph of Gray taken at the Cuyahoga County Jail; even in their blurred, photocopied state, the two photographs do not appear to be of the same person.

4. Fuerst and Ussery argue on appeal that they could not have acted differently even if they had known Gray was the wrong man, because they were not authorized to deviate from the Ohio statutory procedure for extradition. Under that procedure, a person wanted in another state that has requested extradition must be incarcerated for not more than 30 days pending extradition, but only "if ... it appears that the person held

... is the person charged with having committed the crime alleged[.]" Ohio Rev.Code § 2963.13. Gray's case, of course, is premised on the allegation that he did *not* "appear [to be] the person charged with having committed the crime alleged"; Gray alleges that Fuerst and Ussery, as Cuyahoga County sheriff's deputies in possession of a photograph showing Gray not to be the wanted man, were obligated to investigate the case of mistaken identity more thoroughly than they did. While a jury ultimately may side with Fuerst and Ussery, finding that the apparent fingerprint match or other factors made it reasonable for them to believe Gray was the man wanted by the MDOC despite the photograph and physical description, the defendants' argument on appeal provides no reason to deprive the jury of their factfinding role.