**Tito Lesean BURLEIGH,**
**Plaintiff–Appellant,**

v.

**CITY OF DETROIT, et al., Defendants,**

and

**Melvin Williams, Defendant–Appellee.**

**No. 02–1309.**

United States Court of Appeals,
Sixth Circuit.

Nov. 5, 2003.

---

1. The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

Victor S. Valenti, Fieger, Fieger, Schwartz & Kenney, Southfield, MI, Barry S. Fagan, Dib & Fagan, Royal Oak, MI, for Plaintiff–Appellant.

Diane Hutcherson, City of Detroit Law Department, Detroit, MI, for Defendant.

Mark W. Peyser, Karen A. Chopra, Timmis & Inman, Detroit, MI, for Defendant–Appellee.

Before NELSON, GIBBONS, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

In this action under 42 U.S.C. § 1983, Tito Lesean Burleigh seeks relief for false imprisonment, false arrest, and malicious prosecution in violation of state law and his Fourth and Fourteenth Amendment rights. The district court granted summary judgment in favor of the defendant, Sergeant Melvin Williams. Because Burleigh has failed as a matter of law to show that Sergeant Williams violated his constitutional rights, we AFFIRM.

## I.

On October 20, 1997, Norma Hurt was robbed outside a rental property she owned in Detroit, Michigan. At the preliminary examination, she gave the following version of events. When Hurt arrived at the property in her 1997 Lincoln Mark VIII, two men approached her, and one asked Hurt if she knew people in the neighborhood who needed their lawns mowed. When Hurt answered "no," the man pulled a handgun from his pocket and said "this [is] a stickup." Prelim. Hr'g Tr. at 7. The two robbers demanded that Hurt accompany them in her car to a credit union, where she could withdraw money for them. The first robber, who initially accosted Hurt, drove the car. The second robber, later identified as Quentin Spell, sat in the passenger seat, while Hurt rode in the back. On their way to the credit union, Spell searched Hurt's purse and removed money and a cell phone from it. The first robber accompanied Hurt into the credit union, where she withdrew $2,000 for them. Hurt told the men that she would give them more money if they left her unharmed, which they did.

After dropping the men off, Hurt gave the police a statement describing the two robbers. She described the first robber as a black male with a light complexion, five feet four inches tall, 135–40 pounds, and approximately 26 years of age. She described Spell as a 26-year-old black male with a dark complexion, six feet tall, and 140 pounds.

The next day, a man whom Hurt believed to be the first robber called her at work and asked her for more money. He wanted $10,000, and threatened to "snatch [ ] up" her husband, Clifford Hurt, if she failed to comply. Hurt Statement, Oct. 21, 1997. Later that day Hurt gave a statement to Sergeant Melvin Williams about the phone call. She again described the previous day's robbery and the threatening phone call she had received at work.

Shortly after the robbery, Williams obtained a list of calls that had been made from Norma Hurt's stolen cell phone. Williams noted that someone used the cell phone to make four calls to a phone registered to Shirley Burleigh, the sister of defendant Tito Burleigh. On December 10, 1997. Sergeant Williams visited Shirley Burleigh, who gave a description of her brother and who acknowledged that Tito

lived with her. Because this description matched the description of one of the men who robbed Hurt, Sergeant Williams returned to the police station and searched Tito Burleigh's name in a police computer. Williams' research showed a computer description of Burleigh (*e.g.,* height, weight, skin color) that was consistent with Shirley's description of her brother and Hurt's description of one of the robbers.

On January 5, 1998, Sergeant Williams presented Norma Hurt with a photo lineup of approximately twelve photographs. After examining the photos, she selected two but could not be sure either photo depicted one of the robbers. One of the selected photos was of Tito Burleigh. Sergeant Williams, however, did not arrest Tito Burleigh at this point, and the robbery investigation apparently lay dormant for the next six months.

On July 13, 1998, Norma Hurt gave Sergeant Williams a photograph of Quentin Spell and positively identified him as one of the men who had robbed her. Sergeant Williams knew that Tito Burleigh was Quentin Spell's cousin.

On August 27, 1998, Sergeant Williams prepared an investigator's report and submitted it to Margaret Rynier, an assistant prosecutor. Williams provided a brief factual summary of Hurt's robbery and concluded the narrative with these two sentences: "[Hurt] provided photos of Def# 2 [Spell]. Also identifying Def# 1 [Burleigh] through photos." Williams' Investigator's Rep., Aug. 27, 1998. On September 1, 1998, Rynier obtained an arrest warrant for Burleigh.

The police arrested Burleigh on September 25, 1998. At the time of his arrest, he gave a statement declaring his innocence and alleging that a Richard "Mendote," later identified as Richard Mendoza, was Spell's accomplice in the Hurt robbery. Burleigh claimed that Spell and Mendoza told him that they had robbed Hurt. Unable to make bail at the time, Burleigh remained in prison until he gathered enough money for his release in early March of 1999.

The police next arrested Quentin Spell for his role in the Hurt robbery, and he, too, gave a statement to the police. On September 30, 1998, Spell told Officer Stanley Granger that he had initially come into contact with Norma Hurt because she wanted someone to kill her husband, Clifford. Spell's aunt, Barbara Dodd, introduced Spell and Mendoza to Hurt, and they agreed to the proposed contract killing for $5,000. They planned the murder for October 20, 1997, the day of the Hurt robbery. Spell and Mendoza arrived at Hurt's rental property, and they drove to the credit union to obtain the money. Hurt allegedly wanted the encounter to look like a robbery so that her payment to Spell and Mendoza would be less suspicious. Hurt, however, did not have the full $5,000, and the men did not follow through with the murder that night. Spell also mentioned a later robbery of Clifford Hurt's gambling operation involving "me[,] Richard[,] and another guy." Spell Statement, Sept. 30, 1998.

On the basis of this information, Officer Granger prepared a memo for Sergeant Williams expressing his opinion that Mendoza was the first robber described by Norma Hurt. Granger, however, did not mention Burleigh or for that matter exclude Burleigh from participation in the October 20, 1997 robbery. Granger subsequently uncovered witness reports confirming the later robbery, and also observed in his report that Mendoza was presently in jail on murder charges. Sergeant Williams determined that Spell's statement, even if accepted, did not exculpate Burleigh because Williams believed that there may have been three men in-

volved in the Norma Hurt robbery. In his view, the witness statements from the later robbery left open the possibility that a third man was involved, especially if Norma Hurt's robbery was connected to the later robbery of Clifford Hurt's gambling operation, which purportedly involved three men.

On October 15, 1998, shortly after their arrest, Burleigh and Spell appeared at a state-court preliminary examination. Norma Hurt was the only witness. When asked if she could identify Tito Burleigh as one of the robbers, she said "[t]hat's the one that approached me," then added "I [am] not sure that was him." Prelim. Hr'g Tr. at 6. Although she had difficulty positively identifying Burleigh, Hurt continued to state that she "believe[d] it's him." *Id.* at 41. The trial judge acknowledged Hurt's uncertain identification, but decided probable cause nonetheless existed and bound Burleigh and Spell over for trial.

Less than one month later, Azzam Elder became the prosecuting attorney in Burleigh's case. Elder noticed several "red flags" in Burleigh's file, particularly Spell's post-arrest statement identifying Mendoza as an accomplice in the Hurt robbery. Other incidents led Elder to believe Burleigh was not involved in the robbery. Elder was told for example that Burleigh had a speech impediment, and Hurt claimed that the man she identified as Burleigh did not have a speech impediment. After reviewing the preliminary examination transcript, Elder also learned of Hurt's uncertain identification of Burleigh.

Elder later discovered that Mendoza was in jail awaiting a murder trial. He contacted Hurt and asked her to attend a live line-up where she identified Mendoza as the man who first accosted her on October 20, 1997. According to Elder, Hurt said: "[Mendoza] looks so much like Bur-

leigh, but it's him. He gained a little weight, but I know it's him for sure." Elder Dep. Tr. at 28. Convinced of Burleigh's innocence, Elder dropped the charges against Burleigh on April 7, 1999.

## II.

On November 12, 1999, Burleigh filed a complaint in Michigan state court against the City of Detroit and seven of its police officers, claiming false imprisonment, false arrest, and malicious prosecution in violation of state law and his Fourth and Fourteenth Amendment rights. The defendants removed the case to federal court.

Sergeant Williams filed a motion for summary judgment, which the district court granted. Because a state-court judge had previously decided that probable cause existed for Burleigh's arrest, the district court concluded that collateral estoppel precluded Burleigh from re-litigating the issue in a § 1983 case. This prior determination of probable cause, the court concluded, also barred Burleigh's state-law claims. On February 28, 2002, plaintiff agreed to dismiss the complaint against all other defendants with prejudice. Burleigh now appeals the final judgment rejecting his claims against Sergeant Williams as a matter of law.

## III.

We recently have announced two decisions limiting the application of collateral estoppel in this setting. In *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001), we held that where an initial probable cause determination allegedly rests on a police officer's false statements, the state court's determination of probable cause will not be the "same issue" for collateral estoppel purposes in a subsequent § 1983 action. And in *Hinchman v. Moore*, 312 F.3d 198, 203 (6th Cir.2002), we recognized

that "*Darrah* allows [the plaintiff] a second bite at the probable-cause apple" when a § 1983 claimant alleges that the police made false statements in the course of trying to establish probable cause. Both decisions are inconsistent with the district court's collateral-estoppel ruling. As in those cases, Burleigh claims here that Sergeant Williams relied on false information in trying to establish probable cause.

That does not end our inquiry, however. Because we may affirm the district court's final judgment on any grounds supported by the record, *Brown v. Tidwell,* 169 F.3d 330, 332 (6th Cir.1999), we proceed to address Sergeant Williams' argument that the claims against him nonetheless should have been rejected as a matter of law.

## IV.

In addressing a police officer's qualified-immunity defense, we ask two questions. "[F]irst, we must determine whether the plaintiff has alleged facts which, when taken in the light most favorable to her, show that the defendant-official's conduct violated a constitutionally protected right; if we answer the first question in the affirmative, we must then determine whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right." *Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir.2001); *see Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In applying this two-part test, we review the district court's decision *de novo* and apply familiar principles (including reading all factual inferences in Burleigh's favor) in doing so. *See Sperle v. Mich. Dep't of Corr.,* 297 F.3d 483, 490 (6th Cir.2002) (summary judgment); *Summar ex rel. Summar v. Bennett,* 157 F.3d 1054, 1057 (6th Cir.1998) (qualified immunity).

## A.

Much of Burleigh's case turns on two allegations: (1) Sergeant Williams overstated the evidence against Burleigh, and (2) without this evidence, probable cause for Burleigh's arrest was missing. We consider each argument in turn.

As to the first argument, Burleigh claims that Sergeant Williams knowingly or recklessly made false statements in the investigator's report used to obtain his arrest warrant. In his words, Burleigh says that "there was never a positive identification of [him]. Yet, [Williams] falsely asserted ... that Hurt 'identif[ied] Def# 1 through photos.' " Br. for Appellant at 33. Because Hurt in fact picked out *two* pictures from the photo line-up, only one of which was his, Burleigh claims that Williams overstated the evidence against him.

This alleged exaggeration of the facts need not detain us, however, if other undisputed facts support the state court's probable cause determination. *See United States v. Campbell,* 878 F.2d 170, 171 (6th Cir.1989) (false statements in a supporting affidavit do not invalidate the warrant if the remaining undisputed facts establish probable cause). *See also Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) (probable cause exists when the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense"). *Cf. Hutsell v. Sayre,* 5 F.3d 996, 1003 (6th Cir.1993) ("Police officers are entitled to qualified immunity ..., unless the warrant is so utterly lacking in probable cause that no officer ... would have concluded that a warrant should issue."). In this instance, those other facts show that probable cause exist-

ed for Burleigh's arrest and accordingly that the arrest did not violate his Fourth Amendment rights.

Drawn most favorably to Burleigh, those facts reveal the following. First, after spending nearly an hour with the robbers, Hurt gave the police a description of two black males, one of which matched Burleigh. In her initial statement to police, Hurt said the first robber had a light complexion and was five feet four inches tall, 135–40 pounds and approximately 26 years old. In her statement to Sergeant Williams the following day, she described the first robber as being 22–28 years old, five feet tall, 140–50 pounds, and unshaven. On the date of his arrest, Burleigh was unshaven, had a medium complexion, was five feet five inches tall, weighed 130 pounds, and was 26 years old.

Second, Hurt's assailants took her cell phone and made several calls while in possession of it. Four of those calls went to Shirley Burleigh's telephone. During an interview with Shirley Burleigh prompted by a review of the cell phone records, she acknowledged that Tito was her brother and that he lived with her at the time. She also gave a description of her brother, which matched the description given by Hurt and which matched the police computer description of him.

Third, Hurt provided Williams with a picture of a man she identified as one of the robbers. The picture depicted Quentin Spell, who is Tito Burleigh's cousin. While Spell gave a statement to police implicating a third man (Richard Mendoza) in the robbery, he also gave information suggesting that three men, not two, had been involved in the later robbery of Clifford Hurt's gambling operation. In other words, even if Spell's statement implicating a man already in jail as his accomplice was believed, which it assuredly did not have to be, the statement did not rule out

the possibility that the robberies were connected and Burleigh was still involved in both of them.

Fourth, while Burleigh correctly notes that Hurt could not single him out of a line-up of twelve photos, he does not dispute that Hurt picked out two photos of her assailant, one of which *was* Burleigh. All of this is further supported by Hurt's testimony at the state-court preliminary examination. There, in the presence of Spell and Burleigh, she positively identified Spell as one of the robbers. When asked if she could identify Tito Burleigh, she said "[t]hat's the one that approached me," then added "I [am] not sure that was him." Prelim. Hr'g Tr. at 6. Although she had difficulty positively identifying Burleigh, Hurt continued to state that she "believe[d] it's him." *Id.* at 41.

In reviewing the totality of these circumstances, as we must, *see Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), we conclude that these pieces of evidence amply showed that probable cause existed for Burleigh's arrest and for keeping him in jail until his trial–or, in this instance, until he posted bail. Hurt's partial identification, coupled with the other facts available to Sergeant Williams, supported the officer's actions.

In challenging this conclusion, Burleigh relies on several cases in which § 1983 claimants prevailed after showing officials made false statements in arrest-warrant affidavits. But in those cases, unlike here, the remaining evidence did not support a finding of probable cause. *See Spurlock v. Satterfield,* 167 F.3d 995, 1005 (6th Cir. 1999) ("[D]efendants wrongfully ... fabricated evidence and manufactured probable cause."); *Ortega v. Christian,* 85 F.3d 1521, 1525 (11th Cir.1996) ("[W]e hold that Christian lacked probable cause to arrest and detain Ortega."); *Morales v. Busbee,*

972 F.Supp. 254, 262 (D.N.J.1997) (denying summary judgment to one defendant because "there was no evidence developed against the plaintiff, other than having a name similar to the suspect").

## B.

Burleigh next raises two arguments premised on the statement of Quentin Spell and the report of Officer Granger that Richard Mendoza was involved in the robbery. Neither argument, however, is availing.

Burleigh first argues that both pieces of information should have prompted Sergeant Williams to investigate further whether Burleigh belonged in jail for the Hurt robbery. The problem with this argument, as an initial matter, is that it assumes Williams did not take these facts into consideration. He did. As it turned out, however, Spell's statement raised as many questions as it answered. He not only stated that Richard Mendoza had been involved in the initial robbery, but he also stated that the robberies may have been part of a murder-for-hire scheme and were connected to a related robbery of Mr. Hurt's gambling operation, which included a third assailant. In Williams' view, these components of Spell's statement, together with the other evidence linking Burleigh to the robbery, justified his conclusion that probable cause still existed for Burleigh's arrest. The new evidence merely suggested that three men, not two, had been involved in both robberies. Add to this the fact that Hurt still "believed" at the preliminary examination that Burleigh was one of her assailants, and it seems clear that a reasonable officer could still fairly conclude (as the state trial court did) that probable cause existed for Burleigh's arrest and continued imprisonment.

Nor do the cases upon which Burleigh relies point to a different conclusion.

They stand for the sensible proposition that officers, in making probable cause determinations, should consider all relevant evidence (including exculpatory evidence) and must investigate further if all of the evidence does not show probable cause. *See Gardenhire v. Schubert,* 205 F.3d 303, 318 (6th Cir.2000) ("[T]his Court is not adding a duty to investigate as a factor for establishment of probable cause.... Rather, the officer must consider the totality of the circumstances...."); *Gray v. Cuyahoga County Sheriff's Dep't,* 150 F.3d 579, 583 (6th Cir. 1998) (summary judgment improper for police officers failing to consider exculpatory evidence in their possession when determining probable cause); *Sanders v. English,* 950 F.2d 1152, 1162 (5th Cir.1992) (summary judgment improper because police officer failed to consider evidence in his possession); *Dean v. Earle,* 866 F.Supp. 336, 340–1 (W.D.Ky.1994) (summary judgment improper for officer who never had probable cause to detain plaintiff, and failed to pursue his investigation further through a line-up). In this instance, even if Sergeant Williams' judgment turns out in retrospect to have been wrong, he did consider all of the evidence and he did have evidence of probable cause–as noted above and as the state court itself concluded on the basis of Norma Hurt's in-court identification.

Burleigh next argues that Sergeant Williams had a duty to turn over this exculpatory evidence—the Spell statement and Granger report—to him. Because the argument was raised for the first time in his reply brief on appeal, the argument is waived. *See Overstreet v. Lexington–Fayette Urban County Gov't,* 305 F.3d 566, 578 (6th Cir.2002). At any rate, the argument is misconceived. While Quentin Spell provided Williams with potentially exculpatory evidence—namely, his August 29, 1997

statement that Richard Mendoza was his accomplice in the Hurt robbery, which the Granger memo merely repeats—no evidence indicates that Williams did not disclose this statement to the prosecutors. Azzam Elder, the assistant prosecutor assigned to the case, claimed that Spell's statement was the first "red flag" in Burleigh's file leading him to believe Burleigh was innocent. He noticed this statement soon after taking responsibility for the case, less than one month after the preliminary examination. Accordingly, when Burleigh asserts in his reply brief that he "sat in jail for six months before the fact that Williams had arrested the wrong man finally came to assistant prosecutor Elder's attention," Reply Br. at 17, he is simply wrong.

All things considered, Burleigh cannot establish that his Fourth (and Fourteenth) Amendment rights were violated. He therefore cannot defeat Sergeant Williams' claim to qualified immunity, and we need not consider whether his constitutional rights were clearly established at the time of the violation.

## V.

Burleigh's state-law claims do not fare any better. To prevail on his false arrest, false imprisonment, and malicious prosecution claims under state law, he must prove an absence of probable cause. *See Tope v. Howe,* 179 Mich.App. 91, 445 N.W.2d 452, 459 (1989) ("In order to prevail on a claim of false arrest or false imprisonment, the plaintiff must show that the arrest was not legal, i.e., that it was made without probable cause"); *Matthews v. Blue Cross & Blue Shield of Mich.,* 456 Mich. 365, 572 N.W.2d 603, 610 (1998) ("the plaintiff's burden in a malicious prosecution case is to make a *prima facie* showing that the defendant[ ] ... lacked probable cause"). Because we conclude that probable cause existed as a matter of law for Burleigh's arrest, we affirm the district court's dismissal of these claims as well.

## VI.

For the foregoing reasons, we AFFIRM the district court's judgment.