**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0183n.06

**No. 16-2752**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 09, 2018
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| JAMES EDWARD MEEKS, <br><br> Plaintiff-Appellant, <br><br> v. <br><br> CITY OF DETROIT, MICHIGAN, a Michigan Municipal Corporation; OTHA CRAIGHEAD; DANA RUSSELL; SHAWN SCHMELTER; TERRY CROSS-NELSON; DIEASREE CURRY, all jointly and severally, <br><br> Defendants-Appellees. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

BEFORE: COLE, Chief Judge; McKEAGUE and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** James Meeks appeals the district court's grant of summary judgment in favor of the defendants in his 42 U.S.C. § 1983 malicious prosecution and *Monell* action. For the following reasons, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Early in the morning on June 8, 2015, police officers responded to an armed robbery at a Fast Track Gas Station in Detroit, Michigan. The victim provided the officers with a description of the perpetrator's appearance, clothing, weapon, and the vehicle in which he fled and identified a two-block area in which he believed the perpetrator lived. A few hours later, different officers responded to a carjacking at a Sunoco Gas Station in Detroit, about five miles from the Fast Track. The victim described the culprit's appearance, clothing, and weapon. Shortly thereafter,

officers responded to a carjacking at a Citgo Gas Station about three miles from the Sunoco. The victims described the offenders as two black males in their twenties. The perpetrators arrived in a vehicle that apparently matched the make and model of the car stolen at the Sunoco, and one of the individuals was wearing a gray hoodie, like the perpetrator of the Sunoco carjacking.

Officer Curry of the Detroit Police Department's Crime Intelligence Unit reviewed the police reports from these incidents and identified James Meeks as a person of interest in the Fast Track armed robbery. She prepared a report with this information and sent it to both the detective in charge of the armed robbery investigation and the team investigating the carjackings (the commercial auto theft—or "CATS"—team). Officer Curry's report included a photograph of Meeks and identifying information, including his full name, race, sex, age, date of birth, height, address, and tattoos. Defendant Dana Russell was assigned as the officer-in-charge of the Sunoco carjacking and Defendant Shawn Schmelter was assigned as the officer-in-charge of the Citgo carjacking. Both Russell and Schmelter received Curry's report and the police reports corresponding to their respective incidents and both began investigating.

Defendant Terry Cross-Nelson, also with the CATS team, prepared a photo array. Though Curry's intel report was sent to CATS and Cross-Nelson acknowledges receiving an "Intel Blast," Cross-Nelson claims to have had only Meeks's name and possibly his date of birth when he prepared the photo array. When Cross-Nelson entered Meeks's name into the "mug shot machine," three photos came up on the screen. According to Cross-Nelson, the three photos appeared to him to be of the same person, but as it happened, two were of James Meeks, and the third was of another individual named James Meekslittle. Cross-Nelson rejected one of the photos of Meeks as too bright; of the two remaining photos, he selected the one of Mr. Meekslittle.

When photos initially appear on the mug shot machine screen, no other information is visible; however, after the photo array is completed, the machine prints a lineup composition report, along with the photo array. The composition report includes, alongside each photo, the individual's name, date of birth, social security number if known, and booking identification number.

After Cross-Nelson selected the photo of Meekslittle, chose five "filler" photos, and completed the photo array, he printed the array and the accompanying composition report. The report listed the name "Meekslittle, James D" next to the photo that was supposed to be of Meeks, along with Meekslittle's date of birth, social security number, and booking identification number—all of which were different from Meeks's. Cross-Nelson noticed the name discrepancy at some point but continued to believe that it was Meeks in the photo. Though he seemingly did not expect anyone to verify that the correct suspect had been placed in the photo array, Cross-Nelson testified that he generally passes off composition reports to the officers-in-charge without reviewing them. Defendant Otha Craighead, the supervising sergeant, testified that he relied fully on whoever put the photo lineup together; however, he also testified that the officer leading the investigation is responsible for ensuring that the suspect is in fact the person in the lineup. None of the officers did so.

Cross-Nelson gave the photo array and accompanying documents to Russell and Craighead who then showed the photo array separately to the victim of the Sunoco carjacking and to each victim of the Citgo carjacking. When asked to identify the perpetrator, the Sunoco victim selected the photo of Meekslittle. One of the Citgo victims identified Meekslittle as the perpetrator; the other two were unable to make an identification. A photo array report from the lineup, apparently signed by Russell, appears to contain the initials of one of the Citgo carjacking

victims next to the name "Meekslittle, James D." A second photo array report, with Craighead's signature on it, appears to have the Sunoco carjacking victim's initials next to Meekslittle's name. In both instances, Meekslittle's booking number is listed in the column beside his name.

Following the positive identifications, Meeks was arrested and taken into custody. He had two outstanding warrants stemming from traffic or misdemeanor tickets, which provided an independent basis for his arrest. A search warrant was executed at Meeks's home and no evidence was recovered. Meeks was then interrogated and confessed to the Fast Track armed robbery, but denied involvement in either carjacking. The next day, Russell completed a Warrant Request[1] for the Sunoco carjacking, which included the victim's positive identification.

> A photo array was prepared on Monday, June 8, 2015 by Detective Terry Cross-Nelson and myself (OIC) and Sergeant Otha Craighead showed the photo array to the complainant ([W]). The defendant (Meeks) was identified immediately by the complainant ([W]) as the person who robbed and carjacked him for his 2000 Gray Ford Crown Victoria. . . .
>
> **Admissions and Confessions**
> None
>
> **Show –Ups:**
> Yes, the complainant ([W]) identified the defendant (Meeks) immediately as the person who robbed and carjacked him on Monday, June 8, 2015 at approximately 5:10AM.
>
> **List of Evidence:**
> None

Schmelter's Warrant Request for the Citgo carjacking also contained the erroneous identification. No Warrant Request was made for the armed robbery, and Meeks was never prosecuted for it. Meeks was charged with the two carjackings and remained in custody on a $250,000 cash bond until his preliminary examination hearing on June 24, sixteen days after his

---

[1] Law enforcement officers submit Warrant Request forms to the prosecutor's office to recommend charging a suspect.

arrest. Meeks's attorney raised the identity issue at the hearing and a fingerprint comparison was conducted that established that Meeks was not the same person identified in the photo array (in other words, he was not James Meekslittle). The charges were dismissed with prejudice, and Meeks was released that day.

Meeks brought suit against the individual officers involved in his arrest and prosecution and against the City of Detroit, alleging federal and state claims. The parties agreed to voluntarily dismiss Officer Curry as a defendant. Declining to exercise supplemental jurisdiction, the district court dismissed Meeks's state law claims without prejudice. Meeks's § 1983 malicious prosecution action continued against Craighead, Cross-Nelson, Russell, and Schmelter, and against the City of Detroit pursuant to *Monell*.

The district court subsequently granted summary judgment, dismissing all of the claims against all of the remaining defendants. The court found that Meeks "indisputably suffered a deprivation of liberty" and that the criminal proceeding was resolved in his favor—two of the elements of a malicious prosecution claim—but that Meeks faltered with respect to the "participation" element. Specifically, the court found that Cross-Nelson and Craighead's conduct was too far removed from the ultimate decision to prosecute Meeks, and that while Russell and Schmelter's statements in the Warrant Requests and reports were both "indisputably false to the extent that they pointed to Meeks as the man photographically identified" and "material to the finding of probable cause," Meeks could not show that they were made "deliberately or with reckless disregard for the truth." The court also dismissed the claim against the City of Detroit, finding that there was insufficient evidence of a de facto policy or custom with respect to photo arrays.

Meeks now appeals the district court's grant of summary judgment, arguing that there is sufficient evidence of participation and lack of probable cause, as well as sufficient evidence of a de facto policy, to survive summary judgment.

## II.     ANALYSIS

### A.     Standard of Review

This court reviews the district court's grant of summary judgment de novo. *Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B.     Malicious Prosecution Claim Against the Individual Defendants

#### 1.     § 1983 and Qualified Immunity

Suits against law enforcement officers under 42 U.S.C. § 1983 for the deprivation of a constitutional right are subject to the doctrine of qualified immunity. "Law-enforcement officers enjoy qualified immunity from suit when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *King v. Harwood*, 852 F.3d 568, 582 (6th Cir. 2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). The qualified immunity doctrine provides "ample room for mistaken judgments," *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam)), shielding law enforcement officers from liability unless their "conduct violated a constitutional right that was clearly established law at the time, such that a reasonable

officer would have known that his conduct violated that right." *Johnson*, 790 F.3d at 653 (citing

*Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015)); *see also Mullenix v. Luna*, 136 S. Ct.

305, 308 (2015) (per curiam). In determining whether defendants are entitled to qualified

immunity, the court must view the evidence in the light most favorable to the injured party,

*Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015), but consider "only the facts that were

knowable" to the defendants, *King*, 852 F.3d at 582 (quoting *White*, 137 S. Ct. at 550).

Furthermore, "clearly established law should not be defined at a high level of generality. Rather,

the clearly established law must be particularized to the facts of the case." *King*, 852 F.3d at 582

(citations and internal quotation marks omitted).

## 2. Malicious Prosecution

Meeks brings, and this court recognizes, a "'constitutionally cognizable claim of

malicious prosecution under the Fourth Amendment,' which 'encompasses wrongful

investigation, prosecution, conviction, and incarceration.'" *Sykes v. Anderson*, 625 F.3d 294,

308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006)). Despite

the name, a plaintiff need not show actual malice on the part of the defendants to prevail on a

malicious prosecution claim, though some level of culpability or blameworthiness is required.

*Johnson*, 790 F.3d at 655.

> To make out a claim of malicious prosecution, the plaintiff must establish that:
>
> (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Webb*, 789 F.3d at 659 (citing *Sykes*, 625 F.3d at 308–09).

Prongs three and four are not meaningfully in dispute in this case; Meeks clearly suffered a deprivation of liberty when he was held for sixteen days in jail, and the criminal proceeding against him was resolved in his favor when the charges were dismissed at his preliminary examination hearing. At issue here are prongs one and two—whether the defendants influenced or participated in the decision to prosecute Meeks (the "participation" prong) and whether there was probable cause for the prosecution (the "no probable cause" prong).

We have explained that a police officer violates a person's clearly established right to be free from malicious prosecution—often characterized as an "unreasonable prosecutorial seizure"—when the officer's "deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *Newman v. Township of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014).

> [I]ndividuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has "made, influenced, or participated in the decision to prosecute the plaintiff" by, for example, "knowingly or recklessly" making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants.

*King*, 852 F.3d at 582–83 (quoting *Webb*, 789 F.3d at 660, 665); *see also Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) ("An investigator may be held liable under § 1983 for making material false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest.").

> The clearly established law at the time of this incident is well summarized in *Johnson*:

> In *Sykes,* we recognized that a showing of "malice" is not necessarily essential to a malicious prosecution claim under the Fourth Amendment. But we also observed that the requisite participation in the decision to prosecute after probable cause has ceased to exist must amount to "aiding" the decision in more than a passive or neutral way. And there must be some element of blameworthiness or culpability in the participation—albeit less than "malice." That is, truthful participation in the prosecution decision is not actionable. . . .

> We further clarified the point in [*Robertson v. Lucas*, 753 F.3d 606, 617 (6th Cir. 2014)], holding that even false testimony is not actionable as malicious

prosecution unless deliberate—i.e., given with knowledge of, or reckless disregard for, its falsity. "Allegations of negligence or innocent mistake are insufficient." Even more recently, the rule was succinctly stated in *Newman v. Township of Hamburg*. A police officer violates a suspect's clearly established right to freedom from malicious prosecution under the Fourth Amendment "only when his deliberate or reckless falsehoods result in arrest and prosecution without probable cause."

790 F.3d at 654–55 (citations omitted).

An officer is "deliberately indifferent—and therefore not entitled to qualified immunity—if he mistakenly identifies an individual as a suspect when the individual does not match the suspect's description." *Webb*, 789 F.3d at 662. *Webb*, which was decided the day after Meeks was released, relied on an earlier Sixth Circuit case:

> In *Gray v. Cuyahoga County Sheriff's Department*, the plaintiff was mistakenly incarcerated due to an identity error even though his jailers had in their possession the photograph and physical description of the suspect who was supposed to be incarcerated. We denied qualified immunity to the jailers and held that, in light of apparent differences between the suspect and the plaintiff,
>
>> the principal question for the trier of fact will be whether [the jailers] acted with something akin to deliberate indifference in failing to ascertain that [the plaintiff] they had in custody was not the person wanted by Michigan authorities.

*Id.* at 662–63 (alterations in original) (quoting *Gray v. Cuyahoga Cty. Sheriff's Dep't*, 150 F.3d 579, 582–83 (6th Cir. 1998)). Relying on *Gray*, *Webb* held that, because there was a genuine issue of material fact regarding similarity of appearance in the case before it, and because nothing in the record suggested that the defendant-officer had attempted to confirm the plaintiff's identity, a jury could conclude that the defendant's testimony "contained knowing or reckless falsehoods." *Id.* at 663.

In short, for Meeks to defeat qualified immunity, there must be a genuine dispute of material fact as to whether the defendants acted in a way that would permit an inference of blameworthiness or culpability—"less than malice" but more than "negligence or innocent

mistake"—and that their "deliberate or reckless falsehoods result[ed] in [Meeks's] . . . prosecution without probable cause." *Johnson*, 790 F.3d at 655 (citation and internal quotation marks omitted). If follows, then, that if there was probable cause to prosecute Meeks for the carjackings, there was no constitutional violation. Further, even if there was no probable cause, the defendants will be entitled to qualified immunity if their conduct was the result of negligence or innocent mistake rather than deliberate or reckless conduct. Finally, Meeks must also show a sufficient causal link between the officers' conduct and his prosecution.

### a.     *Legal Standard*

We look first to the participation prong to see if the defendants were sufficiently involved in Meeks's prosecution and acted with the requisite degree of blameworthiness. A plaintiff need not show that the officers *made* the decision to prosecute as long as he can show that they influenced or participated in the decision. *Sykes*, 625 F.3d at 311. The term "participated" is construed "within the context of tort causation principles." *Webb*, 789 F.3d at 660 (quoting *Sykes*, 625 F.3d at 308 n.5). Prosecution must have been a reasonably foreseeable consequence of the defendant's conduct, and the conduct must have actually influenced the decision to prosecute. *See Sykes*, 625 F.3d at 314–15. An indictment or the filing of charges by a prosecutor, if independently supported and insulated from the officers' influence, can break the chain of causation, unless the officer "could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty." *Id.* at 316 (citations and internal quotation marks omitted). The officer must have participated "in a way that aids in the decision, as opposed to passively or neutrally participating," *Webb*, 789 F.3d at 660 (quoting *Sykes*, 625 F.3d at 308 n.5), which requirement is satisfied by showing some "element of blameworthiness or culpability in the participation," *Johnson*, 790 F.3d at 655.

Providing reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements to a prosecutor can constitute participation when (1) those materials formed the basis for the charge, *see Sykes*, 625 F.3d at 316–17, or otherwise "ultimately influenced [a plaintiff's] continued detention," *Mills v. Barnard*, 869 F.3d 473, 482 (6th Cir. 2017) (alternation in original) (quoting *Sykes*, 625 F.3d at 316), and (2) the falsehoods, omissions, or misstatements were made deliberately or with reckless disregard for the truth. In short, "an officer may be held liable for 'making materially false statements either knowingly or in reckless disregard for the truth to establish probable cause.'" *Legenzoff v. Steckel*, 564 F. App'x 136, 146 (6th Cir. 2014) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006)).

Negligence, however, is insufficient. In *Johnson*, the plaintiff alleged that, had the officers followed proper investigation policies, they would have uncovered reasons to question both the veracity of the allegations made against him and whether there was probable cause for his prosecution. 790 F.3d at 652. This court held that the officers' alleged failure to properly investigate—in the absence of any evidence that they had reason to doubt the accuracy or veracity of the victim's allegations—was not sufficiently culpable conduct to constitute participation. *Id.* at 655–56. Similarly, in *Newman*, we denied relief where the alleged mischaracterizations in an officer's affidavit were "not so far off the mark . . . [as] to permit an inference of deliberate or reckless disregard for the truth." 773 F.3d at 772 (citations and internal quotation marks omitted).

###### b.  Application

In the case before us, both Warrant Requests erroneously stated that Meeks had been positively identified as the perpetrator of the two carjackings, when in fact a different person had

been identified.  The Warrant Requests were submitted to the prosecutor, who then brought charges against Meeks.  Those Requests also noted that the physical description given by the victims was similar to Meeks's and that an Intel Report identified Meeks as a possible suspect in a different crime (the Fast Track armed robbery).  The Requests stated that no evidence connected to the carjackings was recovered, including during the search of Meeks's home, and that there was no admission or confession by Meeks regarding either carjacking  In their depositions, both Russell and Schmelter—the officers-in-charge of the two carjacking investigations—testified that without the identification, Meeks would not have been arrested.[2]  The question then is who, if anyone, is responsible for the misidentification and whether that responsibility rises to the level of "participation."  We begin with the officers who submitted the Warrant Requests.

Schmelter, as the officer-in-charge of the Citgo carjacking investigation, completed and signed the Warrant Request for that case, thereby linking his conduct to the decision to bring charges.  *See, e.g.*, *Sykes*, 625 F.3d at 314–17.  Schmelter was not involved in either the creation or administration of the photo array and did not see Meeks in person until court.  While Schmelter did have investigative materials, including the composition report and photo array, when he was preparing the Warrant Request, he did not review them other than to make sure everything was signed and dated.  Defendant Schmelter's lack of diligence is troubling and, given his role as the officer-in-charge of the investigation, likely negligent, but it does not amount to recklessness.  *See Johnson*, 790 F.3d at 656.

Russell's completion of a Warrant Request also sufficiently links her conduct to the decision to prosecute.  *See Sykes*, 625 F.3d at 314–17.  The record suggests that Russell signed

---

[2] In Meeks's malicious prosecution claim, the issue is his prosecution, not his arrest.  Nevertheless, Russell and Schmelter's testimony provides support for Meeks's contention that the "positive" identifications formed the basis for his prosecution.

the photo array report that identified the person in the photo array as Meekslittle and contained Meekslittle's identifying information. Russell's testimony indicates that she may have noticed the name discrepancy, but believed that the use of "Meekslittle" simply meant that Meeks had a hyphenated name (i.e., Meeks-Little). And while Russell had previously received Curry's report, she did not have that or any documents with Meeks's photo or identifying information when she received and administered the photo array lineup. Defendant Russell's failure to take steps to verify that the person identified by two of the victims was, in fact, the suspect was likely negligent, but not reckless.

We look next to the supervisor. As the sergeant supervising the team during the investigation, Craighead gave the "go ahead" to put the photo lineup together, participated in the lineups, administering one of them, and reviewed and approved Russell's Warrant Request. Craighead's signature appears at the bottom of a photo array report that identifies James Meekslittle as the person in the photo; however, Craighead testified that he did not notice the different name. At most, Craighead's failure to catch the error was negligent.

Finally, we turn to Cross-Nelson, the officer who created the photo array. Cross-Nelson admits that he was responsible for placing a photo of Meekslittle, rather than Meeks, into the array and then giving that array to Craighead and Russell. He testified that when he was making the photo array, the photos of Meeks and Meekslittle looked to him to be the same person. Meeks argues that this was not reasonable. The photos in the record do not so discredit Meeks's claim that he and Meekslittle look different as to render Cross-Nelson's belief unassailable. Cross-Nelson also acknowledged that, at some point, he became aware of the name discrepancy, but failed to take any steps to verify the accuracy of the photograph in the lineup.

Assuming a reasonable jury could find that Cross-Nelson's acts and omissions, taken together, were reckless as opposed to merely negligent, Cross-Nelson's conduct must also have been sufficiently connected to the decision to prosecute to constitute "participation." *See Sykes*, 625 F.3d at 314–17. Cross-Nelson did not participate in the administration of the lineups or the preparation or submission of the Warrant Requests. His active participation in the investigation ended when he provided the photo array to Russell and Craighead. Both the administration of the photos lineups and the inclusion of the "positive" identifications in the Warrant Requests separate Cross-Nelson's conduct from the decision to prosecute Meeks for the carjackings. Based on the unique facts of this case, we conclude that even if Cross-Nelson's conduct was reckless, it was too far removed from the decision to prosecute Meeks to constitute participation for malicious prosecution purposes.

Because none of the individual defendants "participated" in or "influenced" Meeks's prosecution, we need not address whether there was probable cause to charge Meeks with the two carjackings.

### C. *Monell* Claim Against the City of Detroit

Meeks also brings a § 1983 claim against the City of Detroit pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging a de facto policy or custom and a failure to train. Meeks argues that the City used an identification procedure that deprived him of his constitutional rights, specifically alleging a de facto policy of not reviewing a photo array either before it is used in a lineup or before a Warrant Request based on a resulting identification is submitted to the prosecutor. Meeks further asserts that the City failed to train its officers in these matters.

A § 1983 claim against a municipality can be based on an informal policy if it is so "persistent and widespread" that it "constitute[s] a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–168 (1970)). "[A] single decision to take unlawful action made by municipal policymakers" can give rise to municipal liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). The term "policymaker" includes "officials 'whose acts or edicts may fairly be said to represent official policy,'" not just members of official legislative bodies. *Id*. at 480 (quoting *Monell*, 436 U.S. at 694). The policy must be the "moving force of the constitutional violation." *Oklahoma City v. Tuttle*, 471 U.S. 808, 819 (1985) (quoting *Monell*, 436 U.S. at 694).

In addition to showing that a policy or custom exists, the plaintiff must demonstrate causation and culpability. The level of culpability required is greater than negligence and, in contexts such as failure to train, has been described as deliberate indifference. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

Where a policy or custom both creates a risk of constitutional injury and caused the plaintiff's injury, showing a pattern of actual constitutional violations may be unnecessary if it was "highly predictable" that the policy in question would cause such a violation. *See Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 409–10 (1997).

> Where the identified policy is itself facially lawful, the plaintiff must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice. Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be plainly obvious.

*Gregory*, 444 F.3d at 752 (citation and internal quotation marks omitted).

Here, Schmelter testified that as the officer-in-charge of an investigation, he does not typically double check the work of the officer creating the photo array. When preparing a Warrant Request, Schmelter does not review the supporting investigatory materials, such as the photo array and composition reports, except to assure that everything is signed and dated. Russell testified that she did not verify that Cross-Nelson had included the right suspect in the photo array. While less explicit than Schmelter's testimony, Russell's testimony could support an inference that she routinely failed to do so. Russell also testified that she always has the defendant's date of birth when preparing photo arrays, though not always the social security number. Cross-Nelson's testimony suggests that he did not necessarily expect anyone to check his work and Craighead's testimony, while somewhat contradictory, lends some support to that expectation. The defendants also testified that they received some formal instruction and training before becoming officers or detectives but received only on-the-job training regarding preparing and presenting photo arrays.

In addition to the testimony of the defendants in this case, Meeks points to two other cases involving misidentification issues in Detroit and to a consent judgment against the City of Detroit and the Detroit Police Department. The cases involve markedly and materially different facts and do not lend any significant support to Meeks's claim that there was an unconstitutional policy or custom of failing to verify photo array lineups. Neither does the consent judgment. First, it was no longer in effect at the time of Meeks's prosecution. In 2014, though "acknowledging that additional work remain[ed] to be done," the court terminated the consent judgment and approved a transition agreement enabling the Department of Justice to maintain oversight over reforms until 2016. Second, to the extent that the transition agreement was

evidence of continuing problems, the consent judgment does not identify or address the kind of violation that Meeks alleges.

Meeks's failure to train claim also fails. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. This court has summarized a plaintiff's two possible means of making the required showing:

> [A plaintiff] can show a pattern of similar constitutional violations by untrained employees and [the defendant's] continued adherence to an approach that it knows or should know has failed to prevent tortious conduct by employees, thus establishing the conscious disregard for the consequences of its action—the deliberate indifference—necessary to trigger municipal liability. Alternatively, [the plaintiff] can establish a single violation of federal rights, accompanied by a showing that [the defendant] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation.

*Shadrick v. Hopkins County*, 805 F.3d 724, 738–39 (6th Cir. 2015) (brackets, citations, and internal quotation marks omitted).

Meeks has shown neither a "pattern of similar constitutional violations," nor that a violation is a "highly predictable consequence" of the City's alleged failure to train. *Shadrick*, 805 F.3d at 738–39. Therefore, his failure to train theory also fails.

### III.     CONCLUSION

The acts and omissions of the defendants in this case resulted in the erroneous incarceration of James Meeks, depriving him of his liberty. The particular circumstances of this case, however, do not rise to the level of a violation of clearly established constitutional law. Accordingly, we **AFFIRM**.