**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2367
_____

NICOLE SCHNEYDER,


v.

GINA SMITH,
Appellant

v.

LAURA DAVIS;
DEFENDER ASSOCIATION OF PHILADELPHIA
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

District Court No. 2-06-cv-04986

District Judge: The Honorable Jan E. Dubois
_____

Argued January 26, 2011

Before: McKEE, *Chief Judge*, SMITH, *Circuit Judge*,
and STEARNS, *District Judge*[*]

(Filed: July 29, 2011)

Peter Carr (Argued)
Alison J. Guest
Todd M. Mosser
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107
   *Counsel for Appellant*

Daniel Silverman (Argued)
Silverman & Associates, P.C.
1429 Walnut Street, Suite 1001
Philadelphia, PA 19102
   *Counsel for Appellee*

————————————

OPINION

————————————

SMITH, *Circuit Judge*.

The Fourth Amendment guarantees the right of the

---

[*] The Honorable Richard G. Stearns, United States District Judge for the District of Massachusetts, sitting by designation.

people to be secure against unreasonable searches and seizures. This case is about a seizure and presents questions of whether and how the Constitution's guarantee applies in the case of a material witness who was jailed for weeks on end, even though the date of the trial in which she was to testify had been pushed back several months. We hold that the Fourth Amendment applies to such a detention, and that it requires a prosecutor responsible for such a detention to inform the judge who ordered the witness's incarceration of any substantial change in the underlying circumstances. We also conclude that the prosecutor in this case had "fair warning" of the constitutional right she is accused of violating, and that she is therefore not shielded from liability by the doctrine of qualified immunity. Finally, we reaffirm our earlier holding that absolute prosecutorial immunity does not apply. We will therefore affirm the District Court's order denying summary judgment to the defendant.

I

Nicole Schneyder was an essential witness in Pennsylvania's effort to bring Michael Overby to justice for rape, robbery, and murder. After apparently being threatened by Overby's family, Schneyder refused to testify, going so far as to pull a knife on a police detective as he attempted to arrest her for the purpose of compelling her appearance in court. Schneyder successfully avoided capture for the duration of Overby's first two trials, so the prosecution offered her prior recorded statements in lieu of her live testimony. This procedure presented obvious Confrontation Clause problems, and Overby's conviction in the second trial

3

(the first ended in a hung jury) was overturned on appeal. *Commonwealth v. Overby*, 809 A.2d 295 (Pa. 2002).[1]

Overby's third trial—at which Schneyder's live testimony would be absolutely necessary—was set to begin on February 2, 2005. Schneyder went into hiding as the trial date approached, leaving the police unable to serve her with a subpoena despite several attempts. Schneyder's mother informed police on one of these occasions that her daughter had no intention of coming into court.

On January 26, 2005, Philadelphia assistant district attorney Gina Smith applied to Judge Rayford Means of the Philadelphia Court of Common Pleas for a warrant authorizing Schneyder's arrest as a material witness pursuant to what is now Pa. R. Crim. P. 522.[2] Rule 522(A) allows a court to "issue process" and "set bail for any material witness" for whom there is "adequate cause for the court to conclude that the witness will fail to appear when required if not held in custody or released on bail." Once process has issued and the witness has been brought into court, Rule 522(B) directs that "the court shall commit the witness to jail" if she is unable to fulfill the bail conditions—provided that the court must release the witness if at any time thereafter she

---

[1] On the fourth try, the Commonwealth succeeded in convicting Overby of murder, robbery, and criminal conspiracy. Schneyder apparently testified at that proceeding.

[2] Rule 522 was formerly codified as Rule 4017. The text of the Rule has not changed, although a new Comment was added in 2006 (after the events giving rise to this appeal) directing that "[w]hen a material witness is to be detained, the court should impose the least restrictive means of assuring that witness's presence."

4

satisfies the court's demands.  Smith's warrant application averred that Schneyder's testimony was "critical," that she "ha[d] been threatened by someone in the defendant's family," and that "[g]iven her previous several failure[s] to appear . . . it is highly unlikely that she will appear for trial." Judge Means issued the warrant, and a police officer apprehended Schneyder that night.

Judge Means scheduled a bail hearing for the next day and appointed public defender Laura Davis[3] to represent Schneyder.  Before the hearing, Judge Means met with Smith and Davis *in camera*.  At this off-the-record meeting, Judge Means advised Smith that he intended to authorize Schneyder's detention until trial, but instructed Smith to inform him in the event that the trial was pushed back from the scheduled date.[4]  On the record, Judge Means expressed distaste for "setting bail on people who are not accused of a crime," but nevertheless ordered Schneyder imprisoned when she could not put up a $300,000 surety. The court also advised the parties (the language in the transcript leaves unclear precisely whom he was addressing): "If the case breaks down, let me know early and I'll let you out."  Judge Means then went on:

> I only intend to keep you on this bail until you testify or the trial is concluded if you did have it on February 2nd and the Commonwealth says, we don't need you anymore, we're done with you, okay, then I will want them to come back

---

[3] Davis is named as a third-party defendant in this suit, but she is not a party to this appeal.

[4] Smith concedes this fact for purposes of the instant motion but would contest it at trial.

to me and say, look, we don't have any need for her. If they make a decision at some point on January 31st, we changed our mind, we don't even need this lady, come back to me so I can bring her down and remove this.

The court ordered an informal status conference for February 14, 2005 to facilitate reassessment of the situation in the event that the trial remained ongoing. According to Judge Means' affidavit, he "explicitly placed the onus on Ms. Smith to notify me if for any reason the case was continued or broke down, as it was my clear intention that, in that event, I would immediately release Ms. Schneyder from custody." Further, he averred that, "[h]ad I been notified that the *Overby* case had been continued, I would have immediately ordered Ms. Schneyder's release."

When February 2 arrived, the *Overby* trial (over which Judge Means was not presiding) was continued until May 25, 2005. Smith did not inform Judge Means of this fact,[5] and Schneyder remained in jail. Smith did not appear for the scheduled February 14 status conference, which led Judge Means to assume that the issue of Schneyder's detention had been mooted by her release. Over the course of the next several weeks, members of Schneyder's family contacted Smith "approximately 25 times" to inquire as to why she was still in jail and to ask when she would be let go. Schneyder's father died on February 28, and on March 1 Schneyder's

---

[5] Smith concedes this point only for purposes of the motion that has given rise to this appeal; she testified in her deposition that she had appeared in Judge Means's courtroom more than once between February 2 and February 14, and that she had informed the judge and his staff of the continuance.

6

sister contacted Paul Conway, chief of the Philadelphia Defender Association's Homicide Unit,[6] in the hopes that he could obtain Schneyder's release for the funeral. Conway was able to secure only an order allowing the plaintiff to visit the funeral home in handcuffs for a few minutes; Schneyder was denied permission to attend the funeral itself.

In the process of obtaining the funeral home release, Conway learned that the trial for which Schneyder was being held was not set to start until late May. In Conway's view, "it wasn't right to keep her there" for such a long time, so he began an effort to free Schneyder from jail. He started by contacting Smith, but she initially refused to agree to Schneyder's release. His next step was to ask that Schneyder be allowed out on house arrest. In the course of preparing that request, Conway made contact with Davis, the public defender who had been assigned to Schneyder at the January 27 bail hearing. Davis provided him with her notes of that hearing, and upon reading them Conway became convinced that Judge Means had meant for Schneyder to be released in the event that the Overby trial did not start on February 2. Put in that context, the fact that Schneyder was still locked up made Conway "really angry." He hustled to Judge Means' courtroom and (according to Conway's account) "astonished" the judge by telling him that Schneyder was still in custody. Judge Means ordered Schneyder discharged shortly thereafter. By this time it was March 21, and Schneyder had

---

[6] Prior opinions in this case have indicated that Conway was a hired attorney when he was in fact a public defender approached for assistance by Schneyder's family. *See Odd v. Malone*, 538 F.3d 202, 206 (3d Cir. 2008); *Schneyder v. Smith*, 709 F. Supp. 2d 368, 373 (E.D. Pa. 2010).

been locked up for 54 days—48 of them after the February 2 continuance.

Schneyder sued Smith and the Philadelphia District Attorney's office, filing a complaint which included claims under 42 U.S.C. § 1983 and state law. Only the § 1983 claim against Smith remains in the case; it alleges that Smith violated Schneyder's Fourth Amendment rights "by failing to notify Judge Means or take any steps to have plaintiff released from custody knowing that she would not be needed as a witness in the underlying criminal case for several more months." The District Court initially granted Smith's Rule 12 motion to dismiss the § 1983 claim on the basis that she was entitled to absolute prosecutorial immunity, but a panel of this court reversed. *Odd v. Malone*, 538 F.3d 202 (3d Cir. 2008).[7] After remand and discovery, Smith invoked both absolute and qualified immunity and moved for summary judgment. The District Court rejected Smith's arguments and denied the motion. *Schneyder v. Smith*, 709 F. Supp. 2d 368 (E.D. Pa. 2010). This appeal ensued.

II

We have appellate jurisdiction under the collateral order doctrine: "28 U.S.C. § 1291 confers appellate jurisdiction over the District Court's denial, at the summary-judgment stage, of [a] defendant['s] claim that [she is] entitled to absolute or qualified immunity, to the extent that denial turns on questions of law." *Bayer v. Monroe Cnty. Children & Youth Servs.*, 577 F.3d 186, 191 (3d Cir. 2009) (citations omitted). There are no material factual disputes,

---

[7] Schneyder's appeal was consolidated with the case of one Korvell Odd; the caption on our prior opinion bears his name.

Smith having conceded various of the plaintiff's factual averments for purposes of this motion.

We review the District Court's denial of summary judgment de novo, applying the same test that the District Court should have applied and viewing the facts in the light most favorable to the nonmoving party. *Id.*

III

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. ---, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). There are two related but distinct inquiries in a qualified immunity case. One is whether the defendant's conduct violated the plaintiff's civil rights; the other is whether the right in question was clearly established at the time of the violation. We conclude that both of these questions should be answered affirmatively, and that Smith is therefore not shielded by qualified immunity.

A

The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides that "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured" in an appropriate action. Setting aside the availability of immunity, the basic cause of action requires

9

that a § 1983 plaintiff prove two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). There is no question that Smith, who acted in her capacity as an assistant district attorney, did so under color of state law. The question under § 1983 is therefore whether Smith's failure to advise Judge Means of the continuance in *Overby* deprived Schneyder of a constitutionally protected right. This inquiry can be subdivided into the questions (1) whether Schneyder's imprisonment violated one or more of her constitutional rights, and, if so, (2) whether Smith's conduct caused the illegal imprisonment.

1

To determine whether Schneyder has made out a violation of her constitutional rights, we first must determine what right she is asserting and whence in the Constitution that right springs. The parties and the District Court have all discussed the right at issue primarily in terms of the Fourth Amendment's proscription of unreasonable seizures. Superficially, at least, Schneyder's imprisonment meets the Supreme Court's definition of a "seizure": "a Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989)). Schneyder's freedom of movement was obviously terminated, and there is ample evidence that Smith intended that result. *See Ashcroft v. al-Kidd* (*al-Kidd II*), 563

10

U.S. ---, 131 S. Ct. 2074, 2080 (2010) ("An arrest, of course, qualifies as a 'seizure' of a 'person' . . . , and so must be reasonable under the circumstances.") (citation omitted). There was, however, some suggestion at oral argument, and in the briefs, that the Fourteenth Amendment's Due Process Clause applies instead.[8]

The question of which Amendment applies is answered, at least in this Circuit, by citation to *Gallo v. City of Philadelphia*, 161 F.3d 217, 222–24 (3d Cir. 1998), wherein we adopted Justice Ginsburg's "continuing seizure" interpretation of the Fourth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 277–80 (1994) (Ginsburg, J., concurring). In her *Albright* concurrence, Justice Ginsburg wrote:

> At common law, an arrested person's seizure was deemed to continue even after release from official custody. See, *e.g.*, 2 M. Hale, Pleas of the Crown *124 ("he that is bailed, is in supposition of law still in custody, and the parties that take him to bail are in law his keepers"); 4 W. Blackstone, Commentaries

---

[8] In order to argue that the Fourth Amendment is not applicable—or at least that its applicability was not clearly established—Smith's briefs distinguish "seizures" from "detentions," arguing that at some point after the arrest Schneyder's incarceration became a "detention" not subject to the Fourth Amendment. The unspoken corollary must be that "detentions" are governed directly by the Due Process Clause; otherwise Smith's proposed distinction would leave a "detained" material witness without any constitutionally protected liberty interest whatsoever.

11

*297 (bail in both civil and criminal cases is "a
delivery or bailment, of a person to his sureties,
. . . he being supposed to continue in their
friendly custody, instead of going to gaol").

*Id.* at 277–78. The purpose of the arrest, regardless of the
nature of the case, "was 'only to compel an appearance in
court,' and 'that purpose is equally answered, whether the
sheriff detains [the suspect's] person, or takes sufficient
security for his appearance, called bail.'" *Id.* at 278 (citing 3
Blackstone, *supra*, at *290 (discussing civil cases); 4 *id.*, at
*297 (explaining that the nature of bail is the same in criminal
and civil cases)). Pre-trial restrictions of liberty aimed at
securing a suspect's court attendance are all "seizures" on this
view; the difference between detention in jail, release on
bond, and release subject to compliance with other conditions
is in the *degree* of restriction on the individual's liberty, not
in the *kind* of restriction. *Id.* Justice Ginsburg went on to
argue that "[t]his view of the definition and duration of a
seizure comports with common sense and common
understanding." *Id.* A person who is "required to appear in
court at the state's command," who may be (for instance)
"subject . . . to the condition that he seek formal permission
from the court . . . before exercising what would otherwise be
his unquestioned right to travel outside the jurisdiction," and
who may suffer diminished employment prospects,
reputational harm, and "the financial and emotional strain of
preparing a defense" continues to labor under a restriction of
his liberty interests even though he is not in custody. *Id.*
Thus even a defendant who is released pending trial "is
scarcely at liberty; he remains apprehended, arrested in his
movements, indeed 'seized' for trial, so long as he is bound to
appear in court and answer the state's charges. He is equally

12

bound to appear, and is hence 'seized' for trial, when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court." *Id.* at 279. On Justice Ginsburg's theory, the plaintiff in *Albright* (also suing under § 1983 for a Fourth Amendment violation), "remained effectively 'seized' for trial for so long as the prosecution against him remained pending." *Id.* The rationale is that a government-imposed restriction on a person's liberty is a seizure governed by the Fourth Amendment if its purpose is to ensure that he appears in court. In contrast, if a pre-trial detainee suffers a deprivation amounting to punishment, his claim is governed by the Due Process Clause: "[A] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). And once a person has been convicted and sentenced, his liberty may be restricted provided that he received the process he was due and that the conditions and duration of his punishment are not "cruel" or "unusual" under the Eighth Amendment.[9] But when the government restricts the liberty of a person who has not been convicted of a crime for the purpose of securing her court appearance, that restriction is a Fourth Amendment seizure.

---

[9] Similar reasoning explains why the detention of a person who has been involuntarily committed, as well as the conditions of his confinement, are governed by the Due Process Clause. *See Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982). While the initial arrest of such a person to compel his appearance at the commitment proceeding might be governed by the Fourth Amendment, once commitment has been ordered he is no longer being detained for the purpose of ensuring that he will appear in court. Thus he is no longer "seized" for Fourth Amendment purposes, and the requirements of due process take over.

We followed this analysis in *Gallo*, stating that it was both "compelling and supported by Supreme Court case law." 161 F.3d at 223. Applying Justice Ginsburg's reasoning, we held that the plaintiff had been seized where he "had to post a $10,000 bond, . . . had to attend all court hearings including his trial and arraignment, . . . was required to contact Pre-trial Services on a weekly basis, and . . . was prohibited from traveling outside New Jersey and Pennsylvania." *Id.* Similarly, in *Johnson v. Knorr*, 477 F.3d 75, 85 n.14 (3d Cir. 2007), we held that the plaintiff's detention in a cell for two days, the requirement that he post bail, and the fact that he was required to appear in court for a hearing constituted a Fourth Amendment seizure. *See also DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005) ("Pre-trial custody and some onerous types of pre-trial, non-custodial restrictions constitute a Fourth Amendment seizure."). The theory undergirding these decisions and Justice Ginsburg's *Albright* concurrence is that substantial pre-trial restrictions on liberty—most prominently, custodial detentions—are "seizures" when they are imposed in order to compel a court appearance.

We acknowledge that this theory may be in tension with our statement in *Torres v. McLaughlin*, 163 F.3d 169, 174 (3d Cir. 1998), that "the limits of Fourth Amendment protection relate to the boundary between arrest and pre-trial detention"—the implication being that once the state's conduct ceases to be an arrest and begins to constitute pre-trial detention (wherever that line may be drawn), the seizure ends and the Fourth Amendment no longer applies.[10] The

---

[10] We also acknowledge that other circuits have declined to adopt Justice Ginsburg's theory. *See, e.g.*, *Harrington v. City of Nashua*, 610 F.3d 24, 33 n.4 (1st Cir. 2010); *Reed v. City of*

14

*Torres* court's statement is not, however, binding on us here. For one thing, *Torres* was decided after *Gallo*, leaving its precedential value on this point in serious doubt.[11]   *See Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 278 n.8 (3d Cir. 2001) ("[T]o the extent that [a case within this Circuit] is read to be inconsistent with earlier case law, the earlier case law . . . controls.") (citation omitted).   Moreover, the above quotation from *Torres* is dicta: the case involved the question whether Torres' *post-conviction* incarceration was a Fourth Amendment seizure.   The answer to that question is "no," even under the Ginsburg-*Gallo* theory.   The *Torres* panel therefore had no need to opine on the limits of the Fourth Amendment's pre-conviction application.   Finally, *Torres* left open the possibility that "there may be some circumstances during pre-trial custodial detention that implicate Fourth Amendment rights," 169 F.3d at 174, and if that is the case then surely the very fact of a pre-trial detention would implicate the right against unreasonable seizures.

We agree with *Gallo*'s assessment of Justice Ginsburg's theory, and therefore reaffirm what *Gallo* at least strongly implied:   When the state places constitutionally significant[12] restrictions on a person's freedom of movement

---

*Chicago*, 77 F.3d 1049, 1052 n.3 (7th Cir. 1996).   As we have explained, *Gallo* would require us to adhere to the continuing seizure theory even if we were otherwise disposed to reject it.

[11] The majority opinion in *Torres* does not cite *Gallo*—though the dissent does.   *See* 163 F.3d at 179 (Debevoise, Dist. J., dissenting).

[12] We hold open the possibility that some conditions on pre-trial release may be so insignificant as not to implicate constitutionally protected liberty interests.   *See, e.g.*, *Kingsland v. City of Miami*, 382 F.3d 1220, 1236 (11th Cir. 2004) (concluding

15

for the purpose of obtaining his presence at a judicial proceeding, that person has been seized within the meaning of the Fourth Amendment.

This theory concerning the "definition and duration of a seizure," *Albright*, 510 U.S. at 278 (Ginsburg, J., concurring), implies that when a material witness is subjected to constitutionally significant restrictions of her liberty for the purpose of securing her appearance at trial, those restrictions are governed by the Fourth Amendment. That Amendment is not limited to criminal suspects, but protects "[t]he right of *the people* to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). Accordingly, the Supreme Court defines "seizure" in general terms: "*a person* has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)) (emphasis added). The Fourth Amendment's protection against unreasonable seizures extends to all of "the people," and the guarantees of the Bill of Rights extend to a person detained as a material witness just as they would extend to anyone else. *See al-Kidd II*, 131 S. Ct. at 2080–83 (applying Fourth Amendment analysis to the arrest and detention of a material witness); *al-Kidd v. Ashcroft* (*al-Kidd I*), 580 F.3d 949, 965 (9th Cir. 2009) ("[M]aterial witness arrests are 'seizures' within the meaning of the Fourth Amendment and are therefore subject to its reasonableness requirement.") (citing *Bacon v. United States*, 449 F.2d 933, 942 (9th Cir. 1971)), *rev'd on other*

that conditions of release not amounting to a "significant deprivation of liberty" did not implicate the Fourth Amendment).

16

*grounds*, 563 U.S. ---, 131 S. Ct. 2074. A person who is subjected to conditions that would constitute a seizure if she had been arrested for a crime is still seized even though she is not a criminal suspect but a material witness. She has been arrested and deprived of liberty for precisely the same purpose as a pre-trial detainee in a criminal case: to ensure that she shows up in court as required by the state. *See Albright*, 510 U.S. at 278–79 (Ginsburg, J., concurring). The Fourth Amendment therefore governs our inquiry into the constitutionality of Schneyder's detention.

2

As we noted above, Schneyder's incarceration plainly meets the Supreme Court's definition of a Fourth Amendment "seizure." But that is not the end of the story, for "what the Constitution forbids is not all searches and seizures, but *unreasonable* searches and seizures." *Elkins v. United States*, 364 U.S. 206, 222 (1960) (emphasis added); *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). In the ordinary criminal case, arrest and detention of a suspect is reasonable if it is supported by probable cause, as determined by the judge who either issues an arrest warrant or conducts a preliminary hearing. *See, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 111–14 (1975). *Gerstein* explained that the probable cause standard "represents a necessary accommodation between the individual's right to liberty and the State's duty to control crime"—that is, it is a particular instance of the Fourth Amendment's more general inquiry into overall reasonableness. *Id.* at 112. This point is further reflected in the fact that while a pre-arrest probable cause determination is to be made by a "neutral and detached magistrate whenever possible," the Fourth Amendment admits of "practical compromise" allowing police to make an on-the-scene

17

probable cause assessment so long as any prolonged restraint of liberty is supported by a prompt post-arrest judicial determination that probable cause does in fact exist. *Id.* at 112–14.

We are not, however, presented with an ordinary criminal case, and despite the parties' arguments and the District Court's opinion (all of which are couched in terms of probable cause), probable cause is an inapposite concept for assessing whether the detention of a material witness was constitutionally reasonable. The phrase "probable cause" appears, on its face, to prescribe only a burden of proof, and the Fourth Amendment does not provide an obvious answer to the substantive question, "probable cause *as to what*?" This is explained by the fact that "*probable cause*, since before the founding, has always been a term of art of criminal procedure." *al-Kidd I*, 580 F.3d at 966. The phrase has meaning, derived from its common-law origins, that is more than its two words would reveal if read in isolation. That is, the term itself supplies an answer to the "as to what?" question. Probable cause demands that the police have reasonably trustworthy knowledge of facts "sufficient to warrant a prudent man in believing *that the* [*arrestee*] *had committed or was committing an offense*." *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (emphasis added) (quoted in *Gerstein*, 420 U.S. at 111; *al-Kidd I*, 580 F.3d at 966). Stated differently, "[t]he substance of all the definitions of probable cause is a reasonable ground for belief *of guilt*." *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (emphasis added) (citations and internal quotation marks omitted) (quoted in *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).[13] *See also al-Kidd I*, 580

---

[13] Smith's opening brief, at 39, quotes the *Brinegar* formulation (citing *Pringle*) but conspicuously elides the phrase

18

F.3d at 966–67 (citing, *e.g.*, *Whren v. United States*, 517 U.S. 806, 811 (1996); *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Locke v. United States*, 11 U.S. (7 Cranch) 339, 348 (1813) (Marshall, C.J.)). "Probable cause as used in the Fourth Amendment is a substantive concept of law. . . . Its meaning embraces not merely a certain quantum of evidence, but a certain quantum of evidence *related to one and only one specific thing*—the commission of a crime. This has always been so." Ricardo J. Bascuas, The Unconstitutionality of "Hold Until Cleared": Reexamining Material Witness Detentions in the Wake of the September 11 Dragnet, 58 Vand. L. Rev. 677, 716–19 (2005). For probable cause to exist, the evidence available must provide police or the warrant-issuing magistrate with reasonable grounds to believe that the person to be arrested is guilty of a crime. This definition of the term renders it irrelevant to an assessment of the legality of the seizure of a material witness: "An arrest of a material witness is not justified by probable cause because [the facts that justify such an arrest] do not constitute the elements of a crime." *al-Kidd I*, 580 F.3d at 967; *see also al-Kidd II*, 131 S. Ct. at 2082, 2083 (discussing the justification for detaining a person as a material witness in terms of "individualized reasons to believe that he was a material witness and that he would soon disappear" and "individualized suspicion," rather than probable cause).[14]

"of guilt"—apparently to avoid grappling with the fact that Schneyder was not arrested or detained because anyone thought her guilty of a crime.

[14] The cases cited for the proposition that probable cause is the appropriate lens through which to view this case do not engage in any analysis of the issue, and we can set them aside. *See Stone v. Holzberger*, 1994 WL 175420, 1994 U.S. App. LEXIS 231 (6th Cir.) (unpublished) (requiring that a detained material witness be

afforded a probable cause hearing without discussing what should be assessed at such a hearing); *White v. Gerbitz*, 892 F.2d 457, 460–61 (6th Cir. 1989) (concluding that a material witness's arrest "was supported by probable cause" without considering the term's applicability); *Bacon v. United States*, 449 F.2d 933, 942 (9th Cir. 1979) (stating uncritically that a material witness's "arrest and detention must be based on probable cause"). *See also* Donald Q. Cochran, Material Witness Detention in a Post-9/11 World: Mission Creep or Fresh Start?, 18 Geo. Mason L. Rev. 1, 18 & n.105 (2010) (noting that "[c]ourts have generally relied on the *Bacon* 'probable cause' standard without any discussion of its reasoning").

   *Bacon* actually read the federal material witness statute to require "probable cause to believe (1) that the testimony of a person is material and (2) that it may become impracticable to secure his presence by subpoena." 449 F.2d at 943 (citation and internal quotation marks omitted). The Ninth Circuit's opinion thus arguably redefined a preexisting constitutional term of art, and to the extent it does so its persuasiveness (along with the persuasiveness of those cases relying on it) is badly undercut. *See* Bascuas, *supra*, 58 Vand. L. Rev. at 715–19 (criticizing *Bacon* and "the idea that 'probable cause' can be redefined from case to case"). *But see* Cochran, *supra*, 18 Geo. Mason L. Rev. at 20–21 (noting that "probable cause is a two-prong concept, possessing both a burden-of-proof component and a substantive component," and arguing that in material witness cases the substantive component is not guilt of a crime but "the risk that a miscarriage of justice will occur" absent the witness's testimony). The Ninth Circuit panel that decided *al-Kidd I* interpreted *Bacon* as having only imported the burden-of-proof element of probable cause, which it then applied to the federal material witness statute's substantive requirements. 580 F.3d at 967–68.

20

So while the Fourth Amendment applies here, the probable cause requirement cannot. The Amendment provides only one standard that could govern this situation: a seizure of an uncharged material witness is constitutionally prohibited if it is "unreasonable."[15] Schneyder's Fourth

---

[15] It can be argued that because (i) the Fourth Amendment requires that warrants be supported by probable cause, and (ii) "probable cause," as defined above, cannot exist for a person seized only as a material witness, the entire practice of issuing warrants for and arresting material witnesses is unconstitutional. *See al-Kidd II*, 131 S. Ct. at 2084–85 (suggesting the possibility of such an argument but noting that plaintiff in that case had not taken that position); *id.* at 2085–86 (Kennedy, J., concurring) (observing that "[t]he scope of the [material witness] statute's lawful authorization is uncertain" because of a possible conflict with the Warrants Clause, but indicating that "material witness arrests might still be governed by the Fourth Amendment's separate reasonableness requirement for seizures of the person"); Bascuas, *supra*, 58 Vand. L. Rev. at 702–19 (Under "the one and only definition of 'probable cause,' the practice of detaining witnesses [can] not . . . survive[] constitutional analysis. Of course, the seizure of one innocent of any wrongdoing can never be supported by 'probable cause' because 'probable cause' for an arrest exists only where there is reason to believe that the prospective arrestee committed a crime."). Like the plaintiff in *al-Kidd*, Schneyder does not argue that all material witness arrests are necessarily unconstitutional; we therefore do not address that question. We assume, with the plaintiff, that her initial arrest was legal and that her detention became unlawful, if at all, once the *Overby* trial had been continued. For reasons explained above, the only way to analyze such a claim under the Fourth Amendment is to inquire into the reasonableness of the detention. We therefore assume for present purposes that the reasonableness framework applies, while

Amendment rights were therefore violated only to the extent that her detention as a material witness was "unreasonable" within the Fourth Amendment's meaning, and Smith is liable under § 1983 only insofar as she caused Schneyder to endure such an "unreasonable" detention. *See al-Kidd I*, 580 F.3d at 968 (interpreting *Bacon* as having held that a material witness seizure is "reasonable" where the statutory requirements are established by a "probable cause" burden of proof).

The "key principle of the Fourth Amendment" is the balancing of various competing interests. *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981) (citation omitted). "To determine the constitutionality of a seizure '[we] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). The question is "whether the totality of the circumstances justifie[s] a particular sort of search or seizure." *Id.* at 8–9. *See also United States v. Awadallah*, 349 F.3d 42, 58–64 (2d Cir. 2003) (applying a balancing analysis to determine whether the length of a material-witness detention comported with the Fourth Amendment); Donald Q. Cochran, Material Witness Detention in a Post-9/11 World: Mission Creep or Fresh Start?, 18 Geo. Mason L. Rev. 1, 22–24 (2010) (proposing a rule combining "probable cause" to believe that the elements of the federal material witness statute are met with a separate reasonable-duration limitation on the length of a detention); *cf. Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)

leaving for another case the possibility that all arrests made without probable cause as to guilt of a crime, including material witness arrests, are ipso facto unconstitutional.

(reading an implicit "reasonable time" limitation into a federal alien detention statute in order to avoid the "serious constitutional problem[s]" that would face an indefinite detention provision).

In *Villanova v. Abrams*, 972 F.2d 792 (7th Cir. 1992), Judge Posner offered a method of analysis for considering the reasonableness of a civil commitment: "In mathematical terms, the test of a reasonable commitment can be expressed by the inequality C<PH, where C is the cost of confinement to the person confined, H is the harm he might do if released, and P is the probability of his doing that harm if released." *Id.* at 796. The premise of this formula is that detention is reasonable where the expected cost to the public of releasing the detainee exceeds the expected cost to the individual of being imprisoned. So as the cost to the plaintiff of being confined increases (e.g., as the incarceration grows longer), so too must the magnitude of the harm to be prevented, or the likelihood of that harm (or both), if PH is to keep pace with C and thus continue to justify confinement. This analysis resembles Learned Hand's famous negligence test, *see United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947), for good reason: "The test of negligence at common law and of an unlawful search or seizure challenged under the Fourth Amendment is the same: unreasonableness in the circumstances." *Villanova*, 972 F.2d at 796; *see also Awadallah*, 349 F.3d at 59 (balancing a material witness's liberty interests against the government's interest in a successful terrorism prosecution). However helpful Judge Posner's approach may be, of course, courts must in the end bear in mind that "the application of standards that can be expressed in algebraic terms still requires the exercise of judgment, implying elements of inescapable subjectivity and

intuition in the decisional calculus." *Villanova*, 972 F.2d at 796 (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992)).

Here, the alleged problem with Schneyder's detention is that it went on for an unreasonable length of time—i.e., longer than the facts of the case warranted. On the "cost to the plaintiff" side of the ledger we have Schneyder's obvious and quite substantial interest, as a citizen not accused of any crime, in being free from incarceration. On the other side, we have the significant harm that might have been done to the Commonwealth's case against Overby, and thus to the overall justice system, by the failure of a critical witness to testify. At the time Schneyder was arrested, the likelihood of that harm was high, as she clearly did not intend to appear in court. Given the relatively brief period of time that she would have had to spend in jail (a maximum of some 19 days, had Schneyder been released on the date of Judge Means' scheduled informal status hearing) in order to remain available for a February 2 trial, we may suppose that her initial arrest and detention were reasonable: the potential cost to Schneyder was not terribly high in comparison with the risk that the prosecution would fall apart in her absence.[16]

This balance, Schneyder argues (or should have argued, had she framed her complaint in terms of reasonableness rather than probable cause), was upset when the trial was pushed back more than three months. While the

---

[16] Schneyder's counsel conceded at oral argument that "there was probable cause to detain [Schneyder] initially"; we assume that he would likewise concede that the arrest and detention until February 2 were "reasonable" under the framework that we have set out.

potential harm to the prosecution's case remained the same, the weight of Schneyder's liberty interest grew considerably: instead of the twelve days that were left before the scheduled status hearing on the date of the continuance, she was suddenly looking at some 131 days in jail before the trial would even start.[17] Even if the risk to the public interest remained high, a jury could find that the cost to Schneyder of being imprisoned outweighed the state's interest in holding her for that extra time. Moreover, a jury could conclude that the risk of harm (that is, P) was not as great as the government would have it. Schneyder seems not to have been especially difficult to apprehend (an officer picked her up on the same night that the warrant issued), and there is evidence that being arrested had impressed on her the gravity of the situation and had thus made it more likely that she would show up for court. A reasonable jury could find that Schneyder's prolonged detention became unreasonable once the case had been continued.[18]

---

[17] In point of fact, Schneyder's wait could well have been much longer: Overby's third trial ended in a hung jury on November 1, 2006, and he was not finally convicted until February 20, 2007—more than two years after Schneyder's initial arrest.

[18] It is a mistake to argue that Smith's failure to comply with Judge Means' order was the essence of the alleged Fourth Amendment violation. A state judge's order cannot have created a federal constitutional right where none otherwise existed. The Fourth Amendment's reasonableness standard is an objective one, *see Scott*, 550 U.S. at 381 (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)), that relies on a balancing of competing interests, as discussed above. Judge Means' words cannot have had any bearing on the relative weights of those interests, although it may have altered Schneyder's subjective (and therefore irrelevant) expectations. *See al-Kidd II*, 131 S. Ct. at 2080 ("Fourth

Schneyder has thus made out a prima facie case that she suffered a Fourth Amendment violation. Section 1983 also requires her to show that Smith was a legal cause of her

Amendment reasonableness is predominantly an objective inquiry. . . . This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts; and it promotes evenhanded, uniform enforcement of the law.") (citations and internal quotation marks omitted); *Whren*, 517 U.S. at 814 ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent.").

Nor can Judge Means' statements constitute a ruling that further detention in the event of a delay in trial would be unreasonable. Such an ex ante assessment cannot take into account all of the circumstances surrounding a given incident: Judge Means cannot have known at the time of Schneyder's bail hearing how long the delay would be; nor could he have taken into account the possibility that the likelihood that Schneyder would appear if freed might change. At most, Judge Means' assessment might have provided some rule-of-thumb guidance. It was not a binding determination of Fourth Amendment reasonableness.

Finally, we note that while Judge Means' order may have placed an obligation upon Smith, that obligation was one that she owed to the court rather than to Schneyder. The proper remedy for the violation of such an order is a disciplinary proceeding or a contempt charge, not a § 1983 suit by a third party. That is, Smith owed two overlapping duties: One to the court, which obligated her to obey the judge's order and which the court may enforce in the same manner as any other order; and another to Schneyder, which obligated Smith not to violate any constitutional rights and which Schneyder may seek to enforce through civil-rights litigation.

unreasonable detention. *See Martinez v. California*, 444 U.S. 277, 284–85 (1980); *Rivas v. City of Passaic*, 365 F.3d 181, 193 (3d Cir. 2004); *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995) (citing Restatement (Second) of Torts §§ 431, 440–53, and finding no proximate causation in a § 1983 excessive-force case). In tort law a person's action is a legal cause of another's injury if "his conduct is a substantial factor in bringing about the harm." Restatement (Second) of Torts § 431. "Lurk[ing]" in this understanding of causation is "the idea of responsibility"; the real question is whether an ordinary person would regard the act in question as having caused the harm, "in the popular sense." *Id.* cmt. a.

On the facts before us, we conclude that Schneyder has made her case. The District Court summarized much of the relevant evidence in the course of making a slightly different point:

> [There was] deposition testimony: (1) that the duty to notify Judge Means of a trial continuance did not rest [on] the Sheriff's Office, the Philadelphia prison system, or the court administration; (2) from Public Defender Paul Conway that defendant "was the only one that ha[d] the information that [Judge Means] needed for him to make the decision" on plaintiff's continued detention; (3) from court personnel working in the chambers of Judges Poserina[19] and Means that defendant's failure to notify Judge Means would not comport with their understanding of usual court practice and procedure; and (4) that following the release of

---

[19] Judge John J. Poserina presided in *Overby*.

27

Korvel Odd on January 13, 2005—who was kept in custody for 37 days after the criminal case for which he was detained as a material witness was dismissed—assistant district attorneys were briefed on safeguards to ensure that no material witnesses were detained improperly. These safeguards included centralizing procedures that required assistant district attorneys to seek a supervisor's approval of a material witness petition before presenting it to the judge; to present the petition to the judge assigned to the underlying criminal case; and to monitor the status of witnesses through the computer system to ensure that they were released promptly. Both Homicide Unit Chief Edward McCann and his assistant, Ann Ponterio, agreed that they "indicated to the unit" in January 2005 "that when a witness is in custody and a case is either over, or is continued, or is guilty, or anything that we must make sure that the witness is released from custody."

709 F. Supp. 2d. at 381–82 (citations omitted). In addition to this evidence, Judge Means' various statements, in chambers and on the record, are relevant in that they indicate that he was reliant on Smith to keep him apprised of *Overby*'s status so that he could monitor the continued reasonableness of Schneyder's detention. Perhaps most importantly, Smith was the only official who was in a position to do anything about Schneyder's incarceration. She was responsible for the issuance of the warrant and Schneyder's subsequent arrest, and there does not appear to be anyone else she can point to

28

as being obligated to take steps to aid the court in monitoring the continued reasonableness of the detention—including by informing the court that the trial date had changed. As Smith should have been well aware, it is the court's role—not a prosecutor's—to assess the legality of an incarceration, and to do so on a continuing basis and in light of changes in the underlying facts. Smith also should have known that the court would be unable to fulfill this function without a good-faith effort on her part to keep Judge Means abreast of developments in the *Overby* case. Schneyder has presented sufficient evidence from which a jury could conclude that Smith's failure to advise the court of the continuance was a substantial factor in causing her Fourth Amendment injury.[20]

Smith's duty as a state official not to cause the violation of anyone's constitutional rights demanded that she advise the court of any substantial change in the circumstances justifying Schneyder's seizure as a material witness. Smith was not required to advocate for Schneyder's release; she was obligated to provide the court with the

---

[20] We recognize the potential here for a superseding cause argument: Judge Means' independent will stood in between Smith's disclosure of the continuance and Schneyder's liberation, so Smith's omission cannot have been a proximate cause of Schneyder's injuries. *See, e.g.*, *Troup v. Sarasota Cnty.*, 419 F.3d 1160, 1166 (11th Cir. 2005) (finding no causation in a § 1983 case where "the continuum between Defendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers") (citation and internal quotation marks omitted). Proximate cause is, however, generally a question for the jury, *see Rivas*, 365 F.3d at 193, and there is ample evidence that Judge Means would have released Schneyder without hesitation had Smith lived up to her obligations.

29

information it needed to properly perform its adjudicative function.  A jury could find that she breached this duty, and thereby proximately caused a violation of Schneyder's Fourth Amendment rights.

5

To summarize what we have said so far:  The liberty interests of a detained material witness are protected by the Fourth Amendment, because this court adheres to Justice Ginsburg's "continuing seizure" theory.  Schneyder's detention was a seizure, but because she was not arrested as a criminal suspect "probable cause" is the wrong lens through which to examine the case.  Instead, to determine whether her rights were violated we must assess whether the seizure was "reasonable" within the Fourth Amendment's meaning.  This requires balancing Schneyder's interests against the government's, and a jury could conclude that Schneyder's interest in going free outweighed the government's interest in keeping her locked up until the new trial date.  If Schneyder's rights were violated, Smith was the only official in a position to prevent it—by keeping Judge Means informed of significant changes in the facts underlying the detention order.  Smith's duty not to cause a violation of Schneyder's constitutional rights required her to promptly report the continuance in the *Overby* case to Judge Means—though she would have been free to argue that continued detention was warranted even in light of the new facts.  Because Smith did not fulfill this obligation, Schneyder has made out a prima facie case for recovery of damages under § 1983.

B

Because the foregoing discussion takes place in the context of qualified immunity, our inquiry is not complete. We still must decide whether the duty we have just identified was clearly established at the time the violation occurred. Ordinarily a constitutional duty is not clearly established simply because of the existence of a broad imperative like the one against "unreasonable . . . seizures." "[I]f the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Thus the usual rule is that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640.

Although *Anderson* appears to require a relatively high degree of specificity before a rule can be called "clearly established," the Court was at pains to emphasize that "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citation omitted). The Court further expounded this principle in a line of cases beginning with *United States v. Lanier*, 520 U.S. 259 (1997). The ultimate question, the Court explained, is whether the defendant had "'fair warning' that his conduct deprived his victim of a constitutional right." *Hope v. Pelzer*, 536 U.S. 730, 740 (2002) (quoting *Lanier*, 520 U.S. at 270–71). The Court went on:

31

> [G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful."

*Lanier*, 520 U.S. at 271 (quoting *Anderson*, 533 U.S. at 640). Most recently, the Court has reiterated:

> To be established clearly . . . there is no need that "the very action in question [have] previously been held unlawful." . . . [O]utrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that "[t]he easiest cases don't even arise." But even as to action less than an outrage, "officials can still be on notice that their conduct violates established law . . . in novel factual circumstances."

*Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. ---, 129 S. Ct. 2633, 2643 (2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999); *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990); *Hope*, 536 U.S. at 741).

"To determine whether a new scenario is sufficiently analogous to previously established law to warn an official that his/her conduct is unconstitutional, we 'inquir[e] into the general legal principles governing analogous factual situations . . . and . . . determin[e] whether the official should have related this established law to the instant situation.'"

*Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 177 (3d Cir. 2011) (quoting *Hicks v. Feeney*, 770 F.2d 375, 380 (3d Cir. 1985)) (alterations in original). In extraordinary cases, a broad principle of law can clearly establish the rules governing a new set of circumstances if the wrongfulness of an official's action is so obvious that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002). A plaintiff "can demonstrate that the right was clearly established by presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional or by presenting evidence that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Estate of Escobedo v. Bender*, 600 F.3d 770, 779–80 (7th Cir. 2010) (citing *Hope*, 536 U.S. at 739–40). "There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances." *K.H.*, 914 F.2d at 851.

Although we are aware of no decision predating Smith's actions that involved the sort of claim that Schneyder has raised here, we are nevertheless convinced that this is one of those exceedingly rare cases in which the existence of the plaintiff's constitutional right is so manifest that it is clearly established by broad rules and general principles. That is, this ought to have been a member of that class of "easiest cases" that, according to Judge Posner, "don't even arise." *Id.*; *Redding*, 129 S. Ct. at 2643. One of the "point[s] of the Fourth Amendment" is to require that decisions involving

33

citizens' security from searches and seizures be made wherever practicable by a "neutral and detached magistrate" rather than by a police officer or prosecutor possessed of a natural bias towards uncovering crime and obtaining convictions. *Johnson v. United States*, 333 U.S. 10, 13–14 (1948). Thus the Court has established that a criminal suspect is entitled to a prompt judicial determination that his arrest and detention is justified by probable cause. *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *Gerstein*, 420 U.S. at 124–25. And numerous courts have reached the almost tautological conclusion that an individual in custody has a constitutional right to be released from confinement "after it was or should have been known that the detainee was entitled to release." *Cannon v. Macon Cnty.*, 1 F.3d 1558, 1563 (11th Cir. 1993); *see also Fairley v. Luman*, 281 F.3d 913, 917–18 (9th Cir. 2002); *Armstrong v. Squadrito*, 152 F.3d 564, 573–76 (7th Cir. 1998); *Gray v. Cuyahoga Cnty. Sheriff's Dep't*, 150 F.3d 579, 582–83 (6th Cir. 1998); *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992); *cf. Baker v. McCollan*, 443 U.S. 137, 144–45 (1979) (assuming that "mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law'"). It should have required little thought about these cases, in light of background knowledge of the operation of the Bill of Rights within the justice system, to have given a reasonable prosecutor "fair warning" that she had a duty to ensure that the incarceration of an innocent person was at all times approved by a judicial officer.

Smith took it upon herself to decide that Schneyder ought to be incarcerated well past the point at which explicit

34

judicial authorization had expired. Whether to keep Schneyder in jail should have been the court's decision, and Smith knew it. Judge Means had announced his intention to let Schneyder go if the trial date were moved, but Smith took the position that "she should be held until she testified." Actually, to say that she "took the position" is too generous, because Smith never presented the court with any such argument. She "advocated" her position by failing to reveal an obviously pertinent fact, thereby preventing the judge from doing his job. Moreover, the stance Smith purports to have taken is so patently erroneous as a matter of constitutional law as to be frivolous. No reasonable prosecutor would think that she could indefinitely detain an innocent witness pending trial without obtaining reauthorization. And there can be no doubt that is what Smith intended. The trial at which Schneyder was to testify did not take place until more than a year and a half after her arrest, and there is no indication that Smith would ever have taken steps of her own volition to free her key witness or even to have her status reviewed. If the initial continuance was not something Smith felt a need to report, there is no reason to think that she would have advised Judge Means of any of the subsequent developments. Were it not for the persistence of Schneyder's family and the generous efforts of a public defender with cases of his own and no prior connection to the plaintiff, there can be no telling how long she would have remained locked up.[21]

---

[21] The judges comprising this panel—all three former prosecutors—feel secure in declaring that any reasonable attorney in Smith's position would have known that her course of action was so outrageous as to be unconstitutional, even in the absence of a case telling her so.

"When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd II*, 131 S. Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The self-evident wrongfulness of Smith's conduct is sufficient to place her in either category. She is not entitled to qualified immunity.

IV

The final issue we must address is whether Smith, as a prosecutor, is entitled to absolute immunity from liability. The court has already answered this question in the negative, *Odd*, 538 F.3d at 214, so the "law of the case" doctrine would ordinarily preclude this panel from reconsidering it. *Pub. Interest Research Grp. v. Magnesium Elektron*, 123 F.3d 111, 116 (3d Cir. 1997). But because this is a rule of discretion rather than a limit on authority, it does not apply in "extraordinary circumstances." *Id.* These "include situations in which: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *Id.* (citations omitted). Smith of course thinks that our earlier adverse ruling was wrongly decided; she bolsters this position by asserting that both newly developed facts and the Supreme Court's intervening decision in *Van de Kamp v. Goldstein*, 555 U.S. ---, 129 S. Ct. 855 (2009), have sufficiently altered the landscape that our earlier decision should be disregarded. Notwithstanding these changes in context, we remain of the view that granting prosecutorial immunity would be inappropriate in this case.

A

Before considering Smith's arguments, we briefly rehearse the rationale for denying absolute immunity that we set forth in *Odd*. The basic premise behind the immunity doctrine is that prosecutors should not be encumbered by the threat of civil liability while performing judicial or quasi-judicial functions. *See Odd*, 538 F.3d at 208. But a person is not immune from suit for every wrong he commits just because he happens to be employed as a prosecutor: the "inquiry focuses on 'the nature of the function performed, not the identity of the actor who performed it.'" *Id.* (quoting *Light v. Harris*, 472 F.3d 74, 78 (3d Cir. 2007)). Analysis of prosecutorial immunity questions thus has two basic steps, though they tend to overlap. The court must ascertain just what conduct forms the basis for the plaintiff's cause of action, and it must then determine what function (prosecutorial, administrative, investigative, or something else entirely) that act served. *See id.*

The first stage "focuses on the unique facts of each case and requires careful dissection of the prosecutor's actions." *Id.* at 210 (citations omitted). Thus in *Odd* we "carefully defin[ed] the act (or rather omission) that gave rise to Schneyder's suit" as a "failure to notify Judge Means (per his order and per local custom) that the *Overby* case had been continued." *Id.* at 212. Elsewhere we described it as an omission to "inform[] the court about the status of a detained witness." *Id.* at 213. From these definitions, "it follow[ed] that Smith is not entitled to absolute prosecutorial immunity," because her obligation "was primarily administrative, especially in light of Judge Means's explicit order that he be advised of any delay in the *Overby* proceedings. Smith's duty

37

to advise Judge Means of these facts required no advocacy on her part." *Id.*

We then raised three additional points to bolster our conclusion. First, because of the continuance in *Overby*, "Smith's failure to act occurred during [a] period of judicial inactivity"—a fact that "cast[] serious doubt on Smith's claims that her actions [were] 'intimately associated with the judicial phase' of the litigation." *Id.* at 213–14 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). Second, in light of Judge Means' alleged orders that Smith inform him of changes in *Overby*'s status, the court stated: "We can imagine few circumstances under which we would consider the act of disobeying a court order or directive to be advocative, and we are loath to grant a prosecutor absolute immunity for such disobedience." *Id.* at 214. Finally, we pointed out that the custom and practice of the Philadelphia courts was to assign sole responsibility for monitoring material witnesses to the District Attorney's Office and to individual prosecutors, and that the gist of this obligation (consistent with Fed. R. Crim. P. 46(h)) is "plainly administrative." *Id.* All this together convinced us that the duty Smith failed to fulfill was an administrative one, lacking any significant discretionary or advocative component. Accordingly, we ruled that absolute immunity was inapplicable. *Id.*

B

We now turn to Smith's arguments for setting our prior decision aside. First, she proffers "new evidence" in the form of the transcript of Schneyder's bail hearing. On Smith's reading, the colloquy between Judge Means, Smith, and Schneyder contains no explicit directive that Smith advise the

38

court in the event of a continuance. Smith claims that in the absence of a clear order, her decision regarding what to tell the court was discretionary and thus not administrative.

Even were we to accept Smith's interpretation of the evidence (contrary to the rules governing adjudication of her own motion for summary judgment), her argument is mistaken in its dependence on the *Odd* panel's references to the alleged order as the source of an administrative duty. While the order was a relevant and supporting consideration, it was not determinative of the court's conclusion. As explained above, *see supra* note 18, the duty being enforced in this lawsuit arises from the Constitution, not from the authority of a state judge's order. Thus we must ask whether Smith's violation of that constitutional obligation constituted an administrative act or an advocative one. Whether or not the judge issued an order therefore does not control the case, and Smith's new evidence is unavailing.

C

The next question is whether the Supreme Court's decision in *Van de Kamp v. Goldstein* abrogates the legal conclusion we reached in *Odd*. Goldstein had been convicted and imprisoned after the prosecution failed to provide defense counsel with important information which could have been used to impeach an informant-witness. After the evidence came to light, Goldstein sued under § 1983, arguing that the failure to disclose violated his constitutional rights. Because the two defendants in *Van de Kamp* occupied managerial and oversight roles and were not individually responsible for withholding the information, Goldstein advanced theories of failure to adequately train and supervise the prosecutors who

39

worked under them, and of failure to maintain an information system about informants. *See* 129 S. Ct. at 859.

The Supreme Court concluded that the defendants were entitled to absolute immunity. After setting out the basic functional approach outlined above, the Court reasoned that while the supervisory, training, and management functions in question were properly characterized as administrative, the obligations they created were "directly connected with the conduct of a trial." *Id.* at 862. Writing for a unanimous Court, Justice Breyer first observed that a low-level prosecutor would be immune from suit for the underlying failure to disclose. *Id.* It followed that supervisory prosecutors would also be immune from a direct attack on their actions relating to a particular trial (i.e., their own failure to find and turn over the evidence in question), because such actions would also be closely associated with the judicial process. *Id.* From there the Court argued that there is no way to draw a clean line between supervision and training related to a particular case and an office's more general policies and practices. *Id.* at 862–63. Although the development and implementation of such general policies are administrative in nature, the practices in question "concern[ed] how and when to make impeachment information available at a trial. They are thereby directly connected with the prosecutor's basic trial advocacy duties." *Id.* at 863. Allowing the suit to go forward would open up prosecutors' offices to suit in virtually every case in which a line prosecutor makes a mistake for which he is personally immune. This would have been both anomalous and contrary to the purposes of the absolute immunity doctrine. *See id.*[22]

---

[22] As regards the failure to maintain an adequate information system, the Court reasoned that allowing the claim to

40

Smith argues, and we agree, that *Van de Kamp* establishes subcategories within the "administrative" class of official functions. That is, some administrative functions relate directly to the conduct of a criminal trial and are thus protected, while others ("concerning, for example, workplace hiring, payroll administration, the maintenance of physical facilities, and the like," *id.* at 862) are connected to trial only distantly (if at all) and are therefore not subject to immunity. The question is whether *Van de Kamp* alters the result in *Odd*.

One thing that *Van de Kamp* does not change is our characterization of the conduct in question as the nonperformance of a constitutional duty to advise the court of a significant change in the circumstances surrounding the detention of a material witness. We also continue to think that this duty is, broadly speaking, administrative rather than advocative. After *Van de Kamp*, we must ask the further question whether this is the sort of administrative duty the performance or nonperformance of which is protected by prosecutorial immunity. We hold that it is not.

As we stated in *Odd*, there was no advocative or discretionary dimension to Smith's dereliction of her duty. She was the only person with knowledge of the relevant facts, and she was obligated to ensure that the court had information sufficient to monitor Schneyder's status. Smith was not obligated to argue for Schneyder's release; she was required

---

go forward would force courts to inquire not only into whether to maintain such a system, but also into the system's operation and contents. This, in the Court's view, would require review of prosecutors' exercise of legal judgment—exactly the kind of thing prosecutorial immunity is meant to prevent. *See Van de Kamp*, 129 S. Ct. at 864.

only to do what was necessary to allow the court to perform its oversight function. It is true that this was not a paradigmatic, "workplace hiring" type of administrative duty, but neither was it directly connected to the conduct of a trial. After the continuance, the *Overby* case was a long way off, and it simply is not the prosecutor's prerogative to decide how long to keep a material witness detained. Declining to reveal the change in *Overby*'s status was an abdication of Smith's responsibility to provide the court with information sufficient for it to decide an issue within its sole competence. As the sole government official in possession of the relevant information, Smith had a duty of disclosure that was neither discretionary nor advocative, but was instead a purely administrative act not entitled to the shield of immunity, even after *Van de Kamp*.

V

On the record before us, we conclude that Smith is not entitled to either qualified or absolute immunity. Her motion for summary judgment therefore fails, and we will affirm the District Court's order.

*Schneyder v. Smith*, No. 10-2367

McKee, *Chief Judge*, concurring.


I agree wholeheartedly with the majority's opinion and therefore join my colleague's analysis in its entirety. I write separately merely to suggest that the issue before us is not as complex as the majority's very methodical analysis may imply. Although the rather complex subtlety and nuance of the majority opinion is extraordinarily useful in resolving this issue, it should not give rise to an argument that a reasonable prosecutor could not have anticipated today's result.

The central inquiry before us is simple: would a reasonable prosecutor have known that detaining a material witness for 48 days *after* a trial has been continued may have been contrary to the wishes of the authorizing court, and that this additional detention violated the witness' constitutional rights? *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) It takes neither a panel of federal judges nor a prescient prosecutor to know that the answer to both questions is a resounding "yes."

## I.

There are very important reasons to afford prosecutors immunity from law suits. As the Supreme Court has explained, immunity allows a prosecutor to focus his/her energy and attention on the trial at hand as opposed to having to worry about being forced to "answer in court each time [] a person charged him[/her] with wrongdoing." *Imbler v. Pachtman*, 424 U.S. 409, 425 (1976). It is just as clear that there are also very important policies that counsel against allowing prosecutors to act with impunity by taking it upon themselves to determine when, and if, someone who has been properly incarcerated should be released. This is especially true when additional detention may well be contrary to the instructions of the judge who authorized the initial seizure and detention, and when the circumstances suggest that the judge would no longer allow the person to be incarcerated.

The Supreme Court has cautioned that, "[t]he public trust of the prosecutor's office would suffer if he were

1

constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." *Id.* at 425-26. However, it is no less certain that public trust of that office as well as of the Constitution that the office is sworn to uphold would suffer if prosecutors were allowed to take it upon themselves to decide when and if someone should be released from incarceration.

Here, Smith clearly took it upon herself to decide when and if Schneyder would be released.[1] After Schneyder's family repeatedly called Smith asking when Schneyder could leave state custody, Smith informed them, "*I'm not going to let her go* until this matter is resolved." (App. 257) (emphasis added). The umbrella of immunity surely was not intended to shelter such conduct. The power to release Schneyder did not reside in Smith nor in any other prosecutor. It resided in the court, and it continued to reside there after the *Overby* trial was postponed. Smith may well have been troubled by the prospect of releasing Schneyder and risking an acquittal of Overby, *but that was not her decision to make*. It is certainly not a novel precept of Anglo American jurisprudence to suggest that once the *Overby* trial was continued, Smith should have made any concerns about Schneyder's availability known to Judge Means so that the court could then decide whether it was still reasonable to detain Schneyder under the Fourth Amendment.[2]

---

[1] Since we are reviewing a motion to dismiss, we must accept the evidence in the light most favorable to the plaintiff, and draw all reasonable inferences in her favor. *See Giuffre v. Bissell,* 31 F.3d 1241, 1251 (3d Cir. 1994).

[2] Nor am I concerned that Smith could not have foreseen a Fourth Amendment violation because additional detention appeared to be a due process issue. *See Bell v Wolfish*, 441 U.S. 520, 535 (1979), and Maj. Op. at 13. Regardless of the label, the foundation of the required analysis is surely the same under § 1983. Any reasonable prosecutor should have known the limits of the prosecutorial function and the difference between the role of the prosecutor and the role of the judge. And any reasonable prosecutor should have known that the Constitution is always implicated when a person is deprived of his/her liberty by a state sponsored seizure and subsequent detention.

2

## II.

Smith should have realized that holding Schneyder even after the *Oberby* trial was postponed was contrary to the authority Judge Means had afforded her. At the bail hearing, Judge Means clearly stated on the record that he was uneasy with incarcerating a person who was not accused of any crime in order to obtain her testimony at a subsequent trial. He stated, "I don't like setting bail on people who are not accused of a crime." (App. 55 - 56). He also stated, "if the case breaks down, let me know early and I'll let you out, Ms. Schneyder."[3] (App. 55-56).

Judge Means had every reason to believe that Schneyder would only be held in custody for a few weeks because Smith told the court that the trial would begin "six days from today" and that it would be a "ten-day trial at most." (App. 55-56). Indeed, it is difficult to read this transcript and conclude anything other than that the judge believed that he was only authorizing Schneyder's detention for a couple of weeks - the time it would take to start and finish the *Overby* trial.

Smith's actions were also an unreasonable usurpation of the judicial authority to detain a material witness in light of the prevailing custom in the prosecutor's office. Judge Means testified that the "practice and custom in the Court of

---

[3] In her brief, Smith contends that this statement suggests that the judge placed the onus on Schneyder to notify him about delays in the case. The argument is disingenuous. Judge Means stated in his subsequent affidavit that he "explicitly placed the onus on Ms. Smith to notify [him] if for any reason the *Overby* case was continued or broke down." (App. 215). Moreover, to the extent that the Commonwealth argues that the judge intended for Schneyder to contact him, this is an issue of fact that must be resolved against the Commonwealth at this stage of the proceedings. *See Deary v. Three Un-Named Officers*, 746 F.2d 185 (3rd Cir. 1984).

3

Common Pleas in these situations [involving material witness detentions] is for the prosecutor to bring the matter back to court to address any outstanding issues." (App. 215). That custom is also evidenced by testimony from Edward McCann, then-Chief of the District Attorney's Homicide Unit and Smith's own supervisor. He stated that "it's a well-known office policy and Homicide Unit policy" that Smith would have a responsibility to notify him if a case had been continued and a material witness was held in custody. (App. 84). The policy existed since McCann "came into the DA's office [in 1989]." (App. 84, 90). Thus, a reasonable prosecutor should have realized that she could not take it upon herself to decide when a detained witness would be released from custody.[4]

I do not, of course, suggest that the policy of a prosecutor's office can give rise to a right of constitutional import under § 1983. However, there was nothing unreasonable or novel about Judge Means' request to be told of any continuance in the *Overby* trial because Means was only authorizing Schneyder's detention for the brief period he had been told was necessary to obtain Schneyder's testimony there.

---

[4] As the majority notes, we previously rejected Smith's claim of absolute immunity. In *Odd v. Malone*, 538 F.3d 202, 206 (2008), we considered Smith's appeal along with a similar appeal involving an A.D.A. who refused to inform the authorizing court that the proceeding in which a material witness was to testify had been continued. We noted that the judge in the companion case was "[f]urious," upon learning she had not been informed, and the judge released the witness and "demanded that [the A.D.A.] appear before her to explain why the plaintiff had been forced to remain in jail."

Judge Means' reaction here was similar. Judge Means and his staff were "shocked" and "astonished" when they learned that Schneyder was still incarcerated, and the judge repeatedly apologized to Schneyder. He told her: "again I apologize from the bottom of my heart for what happened to you." (App. 7).

4

## III.

Nothing we say here suggests that a judge in this situation would not have the authority to authorize continued incarceration of a material witness if the trial s/he is to testify at is postponed. Had Judge Means been properly informed of the continuance, he could have again considered the circumstances and competing interests (including Schneyder's liberty interest) and could have concluded - based upon all the circumstances - that Schneyder's continued incarceration was both justified and appropriate.

However, that is not the point. The fact that Schneyder may have remained in custody even if Smith had told the court of the continuance does not mean that Smith is somehow entitled to immunity. Rather, the point of our holding today is quite simply that any reasonable prosecutor should know that the authority to incarcerate belongs to the court, not the prosecutor,[5] and that one who disregards that basic tenet violates a clearly established constitutional right. I think it is helpful to look beneath the intricacies and algebraic equations that assist my colleagues' analysis, because our holding results in nothing more surprising than that extraordinarily unremarkable conclusion. Neither our holding today, nor the reactions of the judges whom I reference in footnote4 should come as a surprise to anyone with even a rudimentary familiarity with the restrictions imposed on the power of the state by the Fourth Amendment, or the distinction between the prosecutorial function and judicial authority.

---

[5] S*ee Odd*, 258 F.3d at 214 ("In short, it is a judicial function - the function of the courts - not a prosecutorial function, to determine whom to incarcerate and for what length of time.").